### Fugate v. Commonwealth.

(Decided March 26, 1920.)

### Appeal from Perry Circuit Court.

1. Arrest—Arrest Without Warrant.—A peace officer may arrest an offender against the law without a warrant, if the offense of which the latter is guilty is committed in his presence.

2. Escape—Force that may be Used to Prevent.—To prevent the escape of a prisoner convicted of a misdemeanor, put in his custody by the trial court for delivery to the jailer of the county, the officer may oppose force to the force employed by the prisoner sufficient to overcome it. If the prisoner, in the attempt to escape, puts the life or person of the officer in jeopardy, the latter may, se defendendo, slay him, but he must not use any greater force than is necessary for his protection.

3. Criminal Law—Instructions—New Trial.—As on the trial of appellant, an officer, under an indictment for the murder of a prisoner in his custody, the instructions of the court, in substantially correct language, gave all the law as concretely stated in the above paragraph, there was no such error in the instructions as entitled him to a new trial.

4. Criminal Law—Escape of Prisoner—Trial.—As much of the evidence conduced to prove that the prisoner, when shot and killed by appellant, was not resisting the latter or attempting to escape, the refusal of the trial court to peremptorily instruct the jury to return a verdict of acquittal was not error.

5. Criminal Law—New Trial—Conduct of Juror.—Where one member of the jury was permitted by the sheriff to hold a brief con-

versation with an outsider, apart from the rest of the jury, upon a subject having no connection with the trial, neither the conversation nor separation gave cause for the granting of a new trial.

6.   Criminal Law—New Trial—Conduct of Jury.—The fact that the sheriff left the jury for a few minutes to procure for them something to eat at a nearby grocery, furnished no ground for a new trial, as before leaving the jury the sheriff locked them together in a room, taking the key with him, and the jury remained locked in the room and were not seen or talked with by any other person during his absence.

H. C. EVERSOLE, CHARLES WOOTON, JESSE MORGAN and EVERSOLE & TURNER for appellant.

CHARLES I. DAWSON, Attorney General, and T. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This appeal is prosecuted by Green Fugate from a judgment of the Perry circuit court, entered upon the verdict of a jury finding him guilty of voluntary manslaughter, and fixing his punishment at confinement in the penitentiary for a term of twenty-one years. The conviction was had under an indictment jointly charging appellant and one Robert Neace with the murder of Will Jackson, a negro. Appellant was accorded a separate trial. It does not appear from the record before us whether Neace was ever brought to trial under the indictment.

A statement of the facts furnished by the bill of evidence, will clear the way to a full understanding of the grounds upon which appellant asks the reversal of the judgment of conviction. The appellant, a young man 34 years of age, is, or claims to be, a minister of the gospel and, at the time of the homicide, was constable of Forked Mouth magisterial district in Perry county. On the morning of the day of the homicide he went to Typo, a railroad station, armed with an automatic pistol. Soon after his arrival he was informed by John Deeton, who with Charlie Geerhart, had preceded him to the depot, that he had just purchased some whiskey of Will Jackson. Acting, as he claimed, on this information appellant immediately went to the depot in search of Jackson, whom he found in the waiting room assigned to colored persons, and, as he further

claimed, caught in the act of making a sale of whiskey. Upon entering the room, appellant drew his pistol, pointed it at Jackson and ordered him to dance, with which command the latter at once complied. When the dance was concluded appellant, with his pistol still presented at Jackson, ordered him to throw up his hands and submit to a search of his person at the hands of Geerhart, which failed to result in the discovery of any whiskey. Appellant thereupon placed Jackson under arrest and, in company with Neace, Geerhart and others, took him to the residence of magistrate Crouch, several miles distant, before whom he was tried and convicted, under a warrant then issued by Crouch, charging him either with illegally selling whiskey, or having it in his possession for sale, in local option territory. At any rate, the judgment of conviction inflicted upon Jackson a fine and imprisonment, causing the issuance of a mitimus requiring appellant as constable to take him to Hazard, the county seat of Perry county, and deliver him to the custody of the jailor; and it was while performing this duty that appellant, late in the afternoon and before reaching the county seat, shot and killed Jackson.

According to much of the evidence appellant appeared to be under the influence of whiskey when Jackson was arrested, and was seen to take one or more drinks before the arrest, as well as others before and after the trial of Jackson. The drinking of any whiskey during that day was denied by appellant, but the force of the denial is greatly weakened and the evidence of his intoxication strengthened by his peculiar, not to say frivolous, conduct in compelling Jackson to dance when arrested, as well as by other acts he was seen to commit between the arrest and killing, all more in keeping with what would be expected of an intoxicated man than a minister of the gospel.

A noticeable feature of appellant's conduct was the ill will he seemed to manifest toward the deceased from the time of his arrest until his death. At one time before arriving at the place of the latter's trial, appellant without apparent cause threatened to shoot him if he did not lessen his gait and remain closer to him; and on the trial of the deceased he performed the part both of prosecutor and chief witness; at one time during the trial becoming so angry at a statement of the deceased to the effect that he had asked him for liquor that morn-

ing, that he interrupted the trial by making a loud denial of the statement and such a showing of resentment toward the author of it, that the presiding magistrate had to rebuke him. Indeed, so harsh had been appellant's conduct toward the deceased on the way to the place of trial and so marked his efforts to secure his conviction, that deceased following the trial requested the court to appoint someone other than appellant to deliver him to the jailor, saying he was afraid that if left in appellant's custody, he would kill him.

In carrying the deceased to Hazard from the place of trial appellant was accompanied by his nephew, a half grown boy, and also by Neace, Deeton and Geerhart, the boy riding a horse and the other members of the party walking. After they had traveled several miles on the way, the deceased, without objection from appellant, paid the boy a dime to let him ride behind on the horse. When the party reached the forks of Willard creek appellant and Geerhart got into a contention about something and stopped to argue the matter, leaving the other members of the party, the boy and deceased in the lead, to proceed on the way. Presently the deceased, discovering that he was perhaps a hundred yards from appellant jumped from the horse and attempted to make his escape by running up the creek. The boy thereupon rode back to appellant and informed him of the escape of the deceased and appellant and Neace getting upon the horse immediately started in pursuit of him. By getting on higher ground than that on which deceased was running, and shooting at him, appellant and Neace succeeded in heading him off from the course he was taking and turning him into a field or bottom on the creek and soon effected his capture.

It was admitted by appellant, and Neace in testifying in behalf of the former, that numerous shots were fired by appellant at the deceased before he was rearrested; both testified, however, that after they ran him into the field and commanded him to surrender, he threw up his hands and said he would do so and at once started back with them through the field; but that upon reaching the lower end thereof he turned and advanced on appellant with a rock in his hand which caused Neace to cry out "watch out" or "don't do that;" that the deceased then threw the rock at appellant, which he dodged, and was in the act of making a second throw when the latter

drew his pistol and commenced shooting at him, and the deceased fell after appellant had fired at him all the shots his pistol contained. In other words it is the contention of appellant that he did not kill deceased in an attempt to recapture him but that the killing was done in his, appellant's, necessary self-defense after the capture had been made.

Neither the appellant, Neace nor the deceased were seen by Deeton, Geerhart or the boy with them when the homicide occurred, but they and several other witnesses, who reside in the immediate neighborhood of the place of the homicide, testified that they heard the shots that were fired by appellant or by both appellant and Neace, and that they seemed to be from ten to fifteen or more in number, and that there was an interval of several minutes between the three or four shots that were first fired and the greater number that followed; and, according to the testimony of the county coroner, the post mortem inquest held by him the day following the homicide disclosed the presence of fifteen pistol shots wounds upon the body of deceased.

It appears from the testimony of Rod McIntosh, corroborated by that of Wm. McIntosh, his father, that upon hearing from the house of the latter, several pistol shots followed by loud talking, they went out on the porch or in the yard and witnessed the shooting of deceased but could not at a distance of 200 yards identify the parties, though they were able to discover that two of them were white men and the third one a negro. They said they saw the three men walking through the field, "he (the negro) was in the road and the two white men was below the road, and all at once he (one of the white men) throwed his gun up that way and shot twice." When asked what effect did the shooting have on the colored man, if any, the witness said: "Well he fell like you had killed anything." . . . "The man that done the shooting just holloed he, he, he."

Rebecca Stacey and her husband, Peter Stacey, testified that they lived about 200 yards from the place of the homicide; that they heard fifteen or sixteen shots fired and were at a barn near their residence at the time, but did not see the shooting. Mrs. Stacey, however, heard somebody say during the shooting "Don't do that, don't do that, I'll go, I'll go;" and her husdand heard the statement: "That got it, or that got him."

In addition to the evidence referred to it was admitted by appellant and Neace that they left the body of the deceased where it fell when shot, and that they made no request of others to see that it received decent interment.

Viewed as a whole, the evidence fails to furnish, even colorable, ground for sustaining appellant's contention that the verdict of the jury finding him guilty of voluntary manslaughter is unsupported by the evidence. Instead of complaining of the refusal of the trial court to peremptorily direct his acquittal, we think he should felicitate himself upon the fact that the verdict of the jury did not find him guilty of murder, rather than voluntary manslaughter.

As the second ground urged for a new trial in the court below, viz., admission of incompetent evidence against appellant and rejection of competent evidence offered in his behalf, is not relied on for a reversal of the judgment, it will not be considered by us further than to say that our examination of the bill of evidence has disclosed no error either in the admission or rejection of evidence.

Careful consideration of the instructions convinces us that they are not open to the objections appellant makes to them. We are unable to understand why he should complain of the giving of the separate instruction on the law of self-defense, as it is correctly expressed and his sole attempted justification of the killing was rested on that ground. The instructions bearing on his right as a peace officer to arrest the deceased and the character of force he was permitted to employ in overcoming a forcible resistance of the arrest on the part of the latter, also accurately gave the law and have been approved by us in numerous cases. Stevens v. Comlth., 124 Ky. 32; Doolin v. Comlth., 95 Ky. 29; Bowman v. Comlth., 96 Ky. 8.

The law on that subject is simply this: if the deceased, as claimed, committed a misdemeanor in the presence of appellant, the latter as a peace officer had the right to arrest him without a warrant and take him before magistrate Crouch for trial. And when following his conviction on such trial, deceased was put in his custody by the court to be delivered to the jailor it was the duty of appellant to use all reasonable means to prevent his escape or, if he escaped, to recapture him. An officer in

arresting or preventing an escape for a misdemeanor, may oppose force to force sufficient to overcome it, even to the taking of life. If the offender put the life of the officer in jeopardy, the latter may, *se defendendo*, slay him, but he must not use any greater force than is necessary for his protection. As the instructions substantially state the law as we have expressed it we must hold them free of error.

The appellant's complaint of the separation of the jury permitted by the sheriff while in his charge did not entitle him to a new trial as urged in the court below. A number of affidavits were submitted for the appellant in support of this ground and for the Commonwealth against it, and the entire matter seems to have been given full consideration by that court in passing on the motion for a new trial. We think it apparent from the affidavits that the alleged separation of the one juror from the others was not a separation in fact or such as gave opportunity for the juror to be talked to about the case or influenced in any way; and furthermore, that at the time the sheriff absented himself from the jury, he left them locked in the room where he had them confined and merely went across the street to a grocery for the purpose of obtaining something for them to eat. It is therefore our conclusion that the facts disclosed by the affidavits failed to show that any opportunity was given for any improper influence to be exercised upon the jury. In other words, the facts seem to bring the case within the rule stated by us in the following cases: Mansfield v. Comlth., 163 Ky. 488; Couter v. Comlth., 176 Ky. 360; Deacon v. Comlth., 162 Ky. 188.

As it is apparent from the record that appellant was accorded a fair trial in the court below, and the verdict is supported by the evidence, the judgment must be and is affirmed.