R. M. TAYLOR v. STATE.*

(*Nashville.* December Term, 1927.)

Opinion filed June 16, 1928.

1. CRIMINAL LAW. MURDER. MANSLAUGHTER. EVI-
DENCE.

The question of whether or not the deceased was actually engaged
in a felony is not determinative in a trial for murder, but the
question of whether or not he was carrying a **loaded** sack has a
bearing upon the reasonableness of the action of an officer in
undertaking to apprehend and arrest the deceased. (Post, p. 425.)

2. CRIMINAL LAW. MANSLAUGHTER. EVIDENCE.

While it might reasonably appear that the deceased was engaged
in a minor felony, it cannot be said that this situation justified
either the intentional slaying of the deceased by the defendant
in attempt to arrest him or the abandonment of reasonable cau-
tion in the use of deadly weapons. (Post, p. 425.)

3. CRIMINAL LAW. MURDER. MANSLAUGHTER. PREPON-
DERANCE OF TESTIMONY.

Conceding that an officer may carry arms and may draw his weapon,
not only for self protection, but in aid of the arrest of one
reasonably suspected or pilfering a few handfulls of coal, cer-
tainly, in the interest of human life, the rule of caution should
not be so far relaxed as to justify such use of the weapon as may
probably destroy life; and where it appears that the deceased
may have been engaged in a minor felony, that two officers were
present, within a few feet of the deceased, who was unarmed, in
such a situation that probably, by the exercise of due diligence,
they might have arrested him without recourse to the use of
deadly weapons; there is no preponderance of the evidence in
favor of the innocence of the defendant. (Post, p. 426.)

4. **CRIMINAL LAW. MURDER. MANSLAUGHTER. CHARGE OF TRIAL COURT. MALUM IN SE. MALUM PROHIBITUM.**

There is a distinction between acts **malum in se** and acts **malum prohibitum**; and while one is not guilty of manslaughter, where a pistol, being carried unlawfully, is accidentally discharged, resulting in a death, it must appear that defendant pointed the pistol at deceased, or intentionally shot it so as to endanger deceased, or otherwise handled the weapon in such a manner as to make the killing a natural or probable result of such conduct; and where the facts of the case plainly show an intent to shoot the pistol in an effort to effect an arrest for a minor felony, unless it was done with reasonable caution, criminal liability for the killing reasonably followed, and the trial court did not commit error in refusing requests, the substance of which called for the addition to the usual definition of manslaughter of the qualification that the killing must have been the natural and probable result of the unlawful act.   (Post, p. 427.)

Distinguishing: Holder v. State, 152 Tenn. (25 Thomp.), 390.

5. **CRIMINAL LAW. ACTIONS OF ATTORNEY FOR STATE. SEMI-JUDICIAL. NOT ERROR.**

While certain expressions of the attorney for the State might well have been omitted in the exercise of that semi-judicial spirit which is proper for the prosecuting representative of the State to evince, the language complained of does not constitute reversible error.   (Post, p. 428.)

6. **PEACE OFFICER. DUTIES. RESPONSIBILITIES.**

It is highly important that officers vested with authority and permitted to carry deadly weapons shall conduct themselves with extraordinary prudence and protect, rather than destroy unnecessarily, the lives of our citizens, however humble.   (Post, p. 428.)

---

*Headnotes 1. Homicide, 29 C. J., section 137; 2. Homicide, 30 C. J., section 569; 3. Homicide, 30 C. J., section 561; 4. Criminal Law, 17 C. J., section 3707.

---

FROM SHELBY.

---

Appeal from Criminal Court of Shelby County.—Hon. J. Ed. Richards, Judge.

Bates, Shea & Fraser and Ewing, King & King, for plaintiff in error.

W. F. Barry, Jr., Assistant Attorney-General, for defendant in error.

Mr. Chief Justice Green delivered the opinion of the Court.

This appeal is from a conviction of involuntary manslaughter. Plaintiff in error, while acting as a special officer for the Southern Railway, commissioned by the Police Department of Memphis, shot and killed a negro man. It is insisted that the killing was accidental, the unintentional result of a lawful effort exercised with reasonable caution to apprehend one guilty of a felony. There is sharp conflict in the testimony as to certain material details.

The killing occurred about 5:30 A. M., shortly before daylight, at a point just within the yard line of the Southern Railway. Taylor and an associated officer, while watching for trespassers on the property of the Railway Company, it having been reported to them that petty stealing, of coal particularly, had been going on, saw and undertook to apprehend the deceased. They testify that the deceased was coming from within the yards and traveling toward the exit into the adjacent street carrying a sack which apparently contained some articles, and that when ordered to halt the deceased ran and dropped the sack, that Taylor pursued and fired first into the ground; that the deceased ran along

the edge of the street and turned on to and ran across the front porch of a store or commissary, in which was a restaurant; that while in the act of pursuing the deceased across this porch the officer again fired his pistol, the bullet passing through the body of the deceased, resulting in his death a few moments later. Witnesses for the State testify that the officer was within a few feet of the deceased and fired directly at him, while the officer says that he fired downward and not at the deceased, having no intention of shooting him, but that the bullet struck the floor of the porch and must have been diverted in its course, striking the deceased, who was at the moment in the act of stepping down from the porch at the far end. It appears that on the trial a plank from the front porch was introduced, and that it bore a mark which seemed to sustain this theory. The theory of the State was that the sack contained nothing, but was an empty sack which the deceased was in the habit of carrying on Saturday mornings for the purpose of conveying home in the afternoon his weekly purchases of groceries, etc. The evidence is sharply in conflict on the question of whether or not the sack contained coal, the insistence of the defense being that the deceased had two lumps of coal in the sack (of the value of about five cents, according to the testimony ), but in view of the excellent character well established of the deceased, the fact that he was an industrious and well to do man, with steady employment, owning his home, taken with other circumstances in the record, we think the jury was well warranted in reaching the apparent conclusion that the deceased was not at the time committing a theft, but that his presence at the point was with a legitimate and innocent purpose. It appears that it had been his habit for

a long time when leaving home for his work to go by this store, or commissary and stop at the public restaurant therein and there join an associate who worked with him in the City, going from there to their place of work.

(1) It is insisted that the question of whether or not the deceased was actually engaged in a felony is not determinative, and this is true, but the question of whether or not he was carrying a *loaded* sack has a bearing upon the issue of the reasonableness of the action taken by this officer in undertaking to apprehend and arrest the deceased.

(2) While he was walking within the yard lines of the railway at the time he was accosted, it is clear that the deceased was at a point commonly visited by the public, within a few feet of one of the entrances to the all night restaurant to which the public were invited and accustomed to frequent. Conceding as contended that (1) the officer was lawfully armed, and (2) that reasonable apprehension that a felony was being committed would afford justification for drawing a loaded pistol and firing it into the air or ground, in an effort to intimidate and arrest a suspected party, it was apparently recognized by able counsel for the defendant that it was important to establish that the deceased was at the time carrying a *loaded* sack,—since otherwise merely a simple trespass was indicated and that on territory not shown to have uniformly been prohibited. This, therefore, became a contested issue. Apparently the jury rejected this contention of the defendant upon the conflicting evidence, with the result that the drastic and dangerous to life method of apprehension adopted was not within the rule of reasonable caution. It follows that the officer as-

sumed responsibility for the disastrous consequences which ensued as the result of any slip or mishap in the use of his gun. Acquitting him of malice and of any intention to slay, his conduct became unlawful and he brought himself directly within the involuntary manslaughter rule.

And the rule may properly be extended a step further. Conceding that the sack gave indication of containing something, the evidence is that it appeared to, contain little of anything, and this probably a few lumps of coal. Now while on this assumption the deceased reasonably appeared to be engaged in a minor felony, it cannot be said that this situation justified either intentional slaying of the deceased in an attempt to arrest him, or the abandonment of reasonable caution in the use of a deadly weapon. The question thus resolved itself to one of fact for the jury as to whether or not the officer, in performing an act not strictly unlawful in itself, acted in an unlawful manner and without due caution. It is fair to assume that the jury adopting this theory of the case found against the defendant, and the evidence does not clearly preponderate against this conclusion. *(3)* Conceding that an officer may carry arms and may draw his weapon, not only for self protection, but in aid of the arrest of one reasonably suspected of pilfering a few handfulls of coal, certainly, in the interest of human life, the rule of caution should not be so far relaxed as to justify such use of the weapon as may probably destroy life. It appears, also, that two officers were present, within a few feet of this unarmed man, and in such a situation that probably, by the exercise of due diligence, they might have arrested him without recourse to a deadly weapon. Without more detailed review of the facts we are not of

opinion that the evidence supports the assignment challenging the preponderance thereof.

(4) By the second and third assignments learned counsel complain of the refusal of the trial judge to give instructions requested, the substance of both requests calling for the addition to the usual definition of manslaughter of the qualification that the killing must have been the natural or probable result of the unlawful act. *Holder* v. *State,* 152 Tenn. (25 Thompson), 390, is relied on. In that case GREEN, C. J., was dealing with a wholly different state of facts. A pistol being unlawfully carried fell from the pocket of plaintiff in error and was accidentally discharged. A conviction of involuntary manslaughter was reversed because the court added to his definition of this offense language which plainly implied that if the plaintiff in error was unlawfully carrying a pistol and this resulted in the accidental killing the offense of involuntary manslaughter would be made out. The distinction was properly drawn and emphasized between unlawful acts *malum in se* and acts *malum prohibitum.* In the latter class of cases quite obviously the act, though unlawful, may have no criminal causal relation to the result, the element of intent being wholly lacking, and in such cases it is essential that the court should add to his definition of the offense of manslaughter "the qualification that the killing must be the natural or probable result of the unlawful act." Here the conduct, if unlawful at all, was *malum in se.* Neither the reasoning of that opinion, nor the authorities cited, control. In the Holder case it was said that, "something more should appear than that he merely carried a pistol in violation of the statute. It must appear that he pointed it at the deceased, or intentionally shot it so as to en-

danger the deceased, or otherwise handled the weapon in such a manner as to make the killing of deceased a natural or probable result of such conduct." While the addition of the qualifying language might have been proper, it was not essential on the facts of this case, which plainly show an intent to shoot the pistol in the effort to affect the arrest, and unless this was done with reasonable caution criminal liability for the killing necessarily followed. Certainly the failure to submit these requests did not constitute reversible error.

(5) Nor are we of opinion that the language of the attorney for the State, complained of by the fourth assignment, constituted reversible error, although certain expressions might well have been omitted in the exercise of that semi-judicial spirit which it is proper for the prosecuting representatives of the State to evince.

(6) It is unfortunate that this officer of an apparently good previous record must feel the heavy hand of that law which it was his duty to enforce, but it is highly important that officers vested with authority and permitted to carry deadly weapons shall conduct themselves with extraordinary prudence and protect, rather than destroy unnecessarily, the lives of our citizens, however humble.

The judgment must be affirmed.

Petition to rehear denied July 14, 1928.