THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JAMES HERBERT WILLIAMS, DEFENDANT-APPEL-LANT.

Argued October 6, 1958—Reargued November 3, 1958—
Decided January 20, 1959.

See also, 46 *N. J. Super.* 98, 134 *A. 2d* 39.

28

30

*Mr. Albert G. Besser* argued the cause for appellant.

*Mr. C. William Caruso,* Special Assistant Prosecutor, argued the cause for respondent (*Mr. Charles V. Webb, Jr.,* Essex County Prosecutor, attorney; *Mr. Maurice J. McKeown,* First Assistant Prosecutor; *Mr. C. William Caruso,* of counsel, on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant was convicted of murder in the second degree and sentenced to serve 15 to 20 years. He appeals directly to this court pursuant to *Article* VI, § V, *paragraph* 1(*c*) of the *Constitution* and *R. R.* 1:2–1(*c*).

■ The principal question is whether the trial court properly charged the ingredients of the crime in the light of defendant's version of the crucial events. The State's evidence conflicted with defendant's account, but for the purpose of the issue presented to us, we must accept the facts most favorable to him.

On March 15, 1957 defendant was graduated from the Newark Police Academy. That evening church services were held at his home, and at about 10:30 P. M. he and some friends left to celebrate. Defendant admitted consuming six whiskeys with beer as "chasers" some hours prior to the shooting. He, however, was found by the police surgeon not to be under the influence of intoxicating liquor at 3:45 A. M., about 1 hour and 20 minutes after the fatal event.

Defendant and his party entered the Peanut Bar a bit short of 2 A. M. While there he saw the deceased, Salvador Touza, approach a woman at the bar and heard her say "Get the hell away from me" as she pushed him. Defendant interpreted this event to suggest solicitation by the

deceased (the State's testimony indicates he merely sought to strike up a conversation which failed without unpleasantness). Defendant did not interrogate the woman, but rather, to avoid a scene, approached the deceased after he left the premises. His purpose was not to arrest, but rather to question and warn against such conduct.

Defendant informed deceased he was a policeman and exhibited his badge. Following inquiry and cautionary remarks concerning soliciting, defendant asked deceased for identification, conceiving the circumstances called for that inquiry. After evasive disclaimers of ability to speak English, deceased suddenly slammed defendant against a railroad retaining wall, causing a laceration and bruising of defendant's hand. At this point we note the conceded fact that deceased had jumped ship in December 1955, was illegally in this country, and hence subject to prosecution and deportation. Defendant was unaware of this at the time, but refers to it in support of his description of deceased's conduct. It is pertinent to add, also, that the autopsy disclosed that at the time of these events deceased was in a stage of intoxication in which an individual would likely be belligerent and irrational in behavior.

The alleged attack upon defendant clearly was a disorderly persons offense for which defendant was empowered to arrest, and defendant did then, for the first time, determine to take deceased into custody. For brief moments, the men were locked in a struggle. Deceased, well-developed, stood 5 feet 4 inches and weighed 200 pounds. Defendant stood 5 feet 10 inches and weighed 172. Defendant was able to reach only his gun (he was armed in compliance with police regulation notwithstanding he was "off duty"), and he struck deceased several blows with the weapon in an effort to subdue him. Deceased broke away, with defendant in pursuit. Deceased ignored a command to halt, and at a considerable distance, defendant fired two warning shots and then two more at the legs, with no expectation of being effective but hoping that a near-miss would induce deceased to stop.

At a point, defendant took another street hoping to cut off the deceased. They met on Bruen Street. Despite orders to raise his hands and get up against a wall, deceased came menacingly toward defendant. In close quarters, defendant fired twice at the legs, with intent to disable but not to kill. The State's expert testified that the shots were fired 14 inches from one thigh and one inch from the other, the point of entrance of both bullets being in the front. The medical examiner testified the wounds ordinarily would not be fatal, but the femoral artery in the left thigh was severed, resulting in death from loss of blood and shock.

In short, defendant testified that all times he acted as a policeman in discharge of his duty as he understood it. On the other hand, the State's thesis was that defendant, a "rookie" officer who had imbibed, was "trigger-happy," exceeded his lawful authority in using the weapon, and indeed fired with intent to kill. There was evidence that, far from offering resistance, deceased was pleading for his life when defendant shot him. We repeat that it is not our proper province to make a factual finding in disposing of the question presently involved; and since we have no way of knowing what evidence the jury believed, we must accept the testimony favorable to defendant for the purpose of testing the correctness of the instructions given to the jury.

The trial court charged the jury could return a verdict of murder in the first degree, or in the second degree, or manslaughter, or acquittal. In outline form, the court:

(1) Stated the basic positions of the State and defense in general terms, in the course of which appears:

"On the other hand, the defendant denied the commission of an unlawful act, contending that as a policeman he was justified in his actions and, secondly, that he is excused because he acted in self-defense. In either of such events there would be no unlawful homicide and so the case would end there * * *."

(2) Charged that "if you should come to the conclusion that the defendant committed unlawful homicide, that

homicide in our law would be presumed to be murder in the second degree."

(3) Then defined murder, saying in part:

"So, too, the crime would be no greater than murder in the second degree if you should find that the intent of the defendant was not to kill, but rather *to inflict great bodily harm* upon the decedent." (*Emphasis added*)

(4) Then discussed manslaughter:

"If you should find that the defendant is guilty of an unlawful homicide but that his intent was *to do less than great bodily harm* to the decedent, then the only crime of which he may be found guilty is manslaughter. Again, if you should find that the defendant committed an unlawful homicide and that his intent was to do great bodily harm, or even to kill, but that he acted under provocation, then the degree of the crime would be mitigated from murder in the second degree to manslaughter." (*Emphasis added*)

(5) Defined a policeman's right to use force, in the course of which appears:

"But a different norm has been developed for the governance of an officer who would arrest one whom he suspects of having broken one of the laws found in the categories of lesser offenses to which I have referred. Here the abhorrence of our law to the taking of human life becomes the paramount consideration, and the police officer must conform to a different code of action in meeting the several possible exigencies which may face him in making an arrest and it is this code of action which is applicable to this case, since there is no evidence that the decedent was suspected of being a felon.

"Where such an offender—and I am speaking now of the perpetrator of a lesser offense—where such an offender is fleeing to avoid arrest, the officer is not justified in killing him, though that be the only feasible means of interrupting the flight. And this principle applies as well to flight undertaken to escape from an arrest already made.

"It is only when the officer encounters physical resistance in the course of making an arrest that he may resort to deadly means to accomplish his purpose. He is not obliged to retreat or desist in the face of resistance. He is, in law, rightfully an aggressor, and he may repel force by force, in order to prevent an escape or to preserve his own life or safety, and if the person making resistance is unavoidably killed in the struggle the homicide is justifiable. But

this rule applies only to the period of struggle or combat. If the struggle be broken off by the prisoner and he escapes and resorts to flight to make good his escape, the officer may not then use lethal means to bring him down, unless perchance, some felony has been committed in. the course of the resistance. In the absence of such a contingency the officer is not permitted to shoot the suspect in order again to capture him while the flight is in progress."

This completes the main body of the charge so far as here pertinent. We note that in item (5) above the court did not charge the degree of the offense if the killing during resistance is not "unavoidable" or if during flight the officer does "use lethal means to bring him down." By reference to the earlier portions, the jury would return a verdict of murder in the second degree in either situation if it found an intent "to inflict great bodily harm." It could find manslaughter only if "his intent was to do less than great bodily harm" or if he acted upon "provocation." This distinction between an intent to do grievous bodily harm and an intent to do less than great bodily harm was later emphasized in dealing with defendant's request No. 16a, as to which the court charged:

"16a I will charge in a modified form. If you find that the defendant, in order to subdue and apprehend the deceased while the latter was fleeing, resorted to shooting, not intending to kill, but merely to disable or frighten the deceased, the shooting, even if un-justifiable, at most amounts to manslaughter.

"I so charge you. But I add to that, this:

"This instruction must be construed in the light of the principles laid down in my main charge, dealing with murder in the second degree and with manslaughter. Thus, *if the defendant meant to do grievous bodily harm to the deceased in order to disable him, then the offense is murder in the second degree. But if the defendant intended to do less than great bodily harm, then he can be guilty only of manslaughter.*" (*Emphasis added*)

Defendant objected to the court's addition.

## I.

Defendant contends his offense would be manslaughter if he shot deceased in flight with intent only to disable, and

complains of the court's qualification that the crime is murder in the second degree if the intent to disable was accompanied by an intent to do grievous bodily injury as distinguished from an intent to do less than that amount of harm.

We cannot concur in a differentiation between an intent to do grievous or great bodily harm and an intent to do less than great bodily harm in the context of a wounding by firearms. When a man shoots another for the purpose of disabling him, it seems inescapable that he intends grievous bodily harm. It would be a rare marksman who could hold the wound to a lesser result and still disable. We think it unrealistic to make the degree of the crime depend upon whether the officer shot to achieve disability by grievous bodily injury or by some lesser hurt. Hence if defendant was entitled to an instruction that his offense would be only manslaughter if he shot with intent to disable, as distinguished from an intent to kill, the instruction given was erroneous and obviously prejudicial.

Malice differentiates murder from manslaughter, and ordinarily an intent to do grievous bodily harm will establish it. *State v. Silverio*, 79 *N. J. L.* 482, 488 (*E. & A.* 1910); see *State v. Alexander*, 7 *N. J.* 585, 598–599 (1951), *certiorari* denied, 343 *U. S.* 908, 72 *S. Ct.* 638, 96 *L. Ed.* 1326 (1952); 2 *Burdick, Law of Crime* (1946), § 448b, *p.* 163; § 450, *p.* 168; § 457, *p.* 181. But where a policeman shoots to disable in a good-faith but mistaken estimate of his right and duty to do so in order to make a lawful arrest, it would not be reasonable to infer the evil or wicked state of mind which is the essence of malice. Police officers are not volunteers. They are armed and required to act to enforce the law. They may err in their judgment and exceed their authority in the sense that they misjudge the need for extreme measures or their right to resort to them. Yet, where the purpose is to comply with duty, it would be unreasonable to impose the measure of criminal responsibility applicable to the citizen whose involvement does not originate in a legal compulsion to act and who is free to turn away.

■ Defendant's request No. 16a obviously was based upon Mr. Justice Depue's charge to the grand jury in 1886, 9 *N. J. L. J.* 167, 168–69, quoted in *Noback v. Town of Montclair,* 33 *N. J. Super.* 420, 428 (*Law Div.* 1954), and cited in *Davis v. Hellwig,* 21 *N. J.* 412, 416 (1956). That charge reads in part:

"But a different rule prevails when the person fleeing and endeavoring to escape arrest is charged with a misdemeanor or a breach of the peace. In these cases the officer has no right to kill the accused to prevent his escape, and if he do so intentionally the offence is murder, and if he resorts to shooting, not intending to kill, but merely to disable or frighten the person escaping, the shooting, though unjustifiable, amounts to manslaughter only."

Thus where a police officer fires at a fleeing misdemeanant (as here used the term includes a disorderly person), the distinction drawn by Mr. Justice Depue is between an intent to kill and an intent to disable or to frighten, and where the intent is to disable or frighten, the offense is manslaughter only. The principle as thus stated is supported by text writers and the fairly uniform expressions in judicial opinions. 2 *Bishop, Criminal Law* (*9th ed.* 1923), § 649, *p.* 493; 2 *Burdick, Law of Crime* (1946), § 432, *p.* 117; 1 *Warren, Homicide* (*perm. ed.* 1938), § 119, *p.* 542; 1 *Wharton, Criminal Law* (*12th ed.* 1932), § 532, *pp.* 773–74; *Champion v. State,* 35 *Ala. App.* 7, 44 *So. 2d* 616, 620 (*Ct. App.* 1949), *certiorari* denied, 253 *Ala.* 436, 44 *So. 2d* 622 (*Sup. Ct.* 1949); *Harding v. State,* 26 *Ariz.* 334, 225 *P.* 482, 484 (*Sup. Ct.* 1924); *Lewis v. Commonwealth,* 140 *Ky.* 652, 131 *S. W.* 517, 519 (*Ct. App.* 1910); *State v. Stancill,* 128 *N. C.* 606, 38 *S. E.* 926, 927 (*Sup. Ct.* 1901); *Vaughn v. State,* 54 *Okl. Cr.* 59, 14 *P. 2d* 239 (*Cr. Ct. App.* 1932); *Sharp v. United States,* 6 *Okl. Cr.* 350, 118 *P.* 675, 676 (*Cr. Ct. App.* 1911); *Commonwealth v. Loughhead,* 218 *Pa.* 429, 67 *A.* 747, 748 (*Sup. Ct.* 1907); *Taylor v. State,* 157 *Tenn.* 421, 7 *S. W. 2d* 50, 51 (*Sup. Ct.* 1928). We see no reason to depart from it.

## II.

Defendant also challenges the portion of the charge quoted above in which, after statement of the rule with respect to the use of force to overcome resistance to arrest, it was added that the rule "applies only to the period of struggle or combat," and "If the struggle is broken off by the prisoner and he escapes and resorts to flight to make good his escape * * * the officer is not permitted to shoot the suspect in order again to capture him while the flight is in progress."

The objection noted at the trial was not too clear. Before us, defendant contends the charge meant that, deceased having broken away from the initial encounter, he remained "in flight" even when the principals became reengaged on Bruen Street, and hence that defendant was denied application of the rule permitting the use of force to overcome resistance to arrest. We are not sure the jury would so have understood the charge, although on the oral argument before us the State insisted that such was its meaning and undertook to defend it as so construed. At any rate, since the case must be retried, we will deal with the issue thus projected.

### A.

We cannot accept the State's thesis that once a misdemeanant breaks and flees, he remains in flight even when the officer succeeds in reengaging him. We can see no public utility in the proposition. On the contrary, it would encourage officers to default in their duty to capture. We see no reason to deny the officer's right, indeed his duty, to use all force reasonably necessary to overcome resistance when he overtakes the offender and seeks to take him into custody. Hence, if the jury accepted defendant's testimony that the shooting occurred in those circumstances, the test of criminal responsibility would be the same as if the shooting had occurred during like resistance in the initial effort to accomplish the arrest.

## B.

■ We should make it clear that we are speaking of physical resistance, actual or offered, by a misdemeanant, and not of his escape from an arrest made or his refusal to obey orders. The latter situations are controlled by the rules applicable to flight by a misdemeanant discussed above. Nor are we speaking of force used after resistance has ceased, in which case the same rule would apply with the qualification that an intentional slaying would be manslaughter if it resulted from heat of blood upon provocation. Where, however, an offender offers physical resistance to arrest or to the maintenance of custody, the officer need not retreat but on the contrary may become the aggressor and use such force as is necessary to overcome the resistance. If such force unavoidably results in the death of the offender, the homicide is justified. " 'This is founded in reason and public utility, for few men would quietly submit to arrest if in every case of resistance the party empowered to arrest was obliged to desist and leave the business undone.' " *Bullock v. State*, 65 *N. J. L.* 557, 572 (*E. & A.* 1900). See also *Antwine v. Jones*, 14 *N. J. Super.* 86, 88 (*App. Div.* 1951); 2 *Bishop, Criminal Law* (*9th ed.* 1923), § 650, *p.* 493; 26 *Am. Jur., Homicide*, § 231, *p.* 315 *et seq.; Annotations*, 3 *A. L. R.* 1170 (1919); 42 *A. L. R.* 1200 (1926).

■ The force used may not be more than reasonably appears to be necessary. *State v. Rogers*, 105 *N. J. L.* 15, 18–19 (*Sup. Ct.* 1928), affirmed on opinion below, 105 *N. J. L.* 654 (*E. & A.* 1929); *Antwine v. Jones, supra* (14 *N. J. Super.*, at *page* 88); *Noback v. Town of Montclair, supra* (33 *N. J. Super.*, at *page* 427). Whether the force used exceeded the needs of the occasion is to be determined on the basis of the facts as they reasonably appeared to the officer at the time of the occurrence. 1 *Wharton, Criminal Law and Procedure* (*Anderson's ed.* 1957), § 207, *p.* 459; *Stinnett v. Commonwealth*, 55 *F. 2d* 644, 645–47 (4 *Cir.* 1932); *State v. Rose*, 142 *Mo.* 418, 44 *S. W.*

329, 331 (*Sup. Ct.* 1898); *State v. Finch,* 177 *N. C.* 599, 99 *S. E.* 409, 414 (*Sup. Ct.* 1919).

## C.

The foregoing principle applies whether the offender be a felon or a misdemeanant. Some jurisdictions differentiate between the two, and as to the misdemeanant limit the officer's right to self-defense. But thus to qualify the officer's right is to require him to retreat in the face of resistance. The more generally accepted view finds the public interest is better served by recognizing the duty and right to make the arrest or to maintain custody acquired and hence gives the officer a corresponding additional mantle of protection from liability. *Bullock v. State, supra* (65 *N. J. L.,* at *page* 572); 1 *Wharton, Criminal Law and Procedure* (*Anderson's ed.* 1957), § 207, *p.* 458; 1 *Bishop, New Criminal Procedure* (*2d ed.* 1913), § 161, *p.* 115; 40 *C. J. S. Homicide* § 137a, *pp.* 1021–1022; *Durham v. State,* 199 *Ind.* 567, 159 *N. E.* 145, 146–147 (*Sup. Ct.* 1927); *State v. Ford,* 344 *Mo.* 1219, 130 *S. W. 2d* 635, 637–640 (*Sup. Ct.* 1939).

## D.

█ If the force exceeded what was necessary under the circumstances as they reasonably appeared to the officer, does it thereupon follow that he is guilty of crime? It may well be for civil purposes that the officer should respond on the thesis that his conduct was at least negligent. See *Davis v. Hellwig,* 21 *N. J.* 412 (1956). But mere negligence is not enough to warrant a finding of criminal homicide.

"Negligence, to be criminal, must be reckless and wanton and of such character as shows an utter disregard for the safety of others under circumstances likely to cause death." 1 *Warren, Homicide* (*perm. ed.* 1938), § 86, *p.* 424.

There is scant discussion in our cases with respect to the point at which criminality attaches. In *State v. Rogers, supra* (105 *N. J. L.,* at *page* 18), the trial court charged the test to be whether the officers used more force than actually was or. reasonably appeared to be necessary; and in *State v. Larsen,* 105 *N. J. L.* 266, 269 (*Sup. Ct.* 1929), the trial judge charged that "Within reasonable limits, the amount of force * * * is necessarily left to the sound discretion of the officer, and the officer is responsible only for a wanton abuse of such force." In neither case, however, was the correctness of the charge an issue on appeal. *Cf. Noback v. Town of Montclair, supra* (33 *N. J. Super.,* at *page* 427).

It is basic in our thinking (except for certain statutory offenses) that for criminal liability there must be "concurrence of an evil-meaning mind with an evil-doing hand * * *." *Morissette v. United States,* 342 *U. S.* 246, 251, 72 *S. Ct.* 240, 96 *L. Ed.* 288 (1952). The mere use of force provides neither element, since the officer is bound to employ it to overcome resistance. When the force exceeds what reasonably appeared necessary, the forbidden conduct is shown but an excess as such is consistent with an honest error of judgment, and no public interest would be served by stamping as a criminal a man who, compelled to act, merely errs in his estimate. The force should be excessive to a point where some culpable attitude is evident. There should appear, in the words of the charge given in *Larsen,* "a wanton abuse." In *State v. Dunning,* 177 *N. C.* 559, 98 *S. E.* 530, 531, 3 *A. L. R.* 1166 (*Sup. Ct.* 1919), the same standard was adopted, the court concluding that "It is when excessive force has been used maliciously, or to such a degree as amounts to a wanton abuse of authority, that criminal liability will be imputed." See also *State v. Brannon,* 234 *N. C.* 474, 67 *S. E.* 2d 633, 638 (*Sup. Ct.* 1951); *Barrett v. United States,* 62 *App. D. C.* 25, 64 *F. 2d* 148, 149 (*D. C. Cir.* 1933); *People of State of Colorado for Use of Little v. Hutchinson,* 9 *F. 2d* 275, 276 (8 *Cir.* 1925); 6 *C. J. S. Arrest* § 13a, *p.* 612. And in

the context of an officer obliged to overcome resistance and to injure to the extent reasonably necessary to that end, wantonness means either a consciousness of the excessiveness of the force or such excess as reveals an utter disregard of the rights of the offender, as distinguished from a good-faith but erroneous estimate of what was needed. In the absence of such wanton conduct, the homicide is justifiable for the purpose of criminal liability.

## E.

█ If an officer thus is guilty of a wanton use of unreasonable force and death ensues, he is guilty of manslaughter. 1 *Warren, Homicide (perm. ed.* 1938), § 119, *p.* 543; 40 *C. J. S. Homicide* § 58, *p.* 922; *State v. Phillips,* 119 *Iowa* 652, 94 *N. W.* 229, 67 *L. R. A.* 292 *(Sup. Ct.* 1903); *State v. Havens,* 177 *S. W.* 2d 625 *(Mo. Sup. Ct.* 1944); *State v. Montgomery,* 230 *Mo.* 660, 132 *S. W.* 232 *(Sup. Ct.* 1910); *State v. Rose, supra* (44 *S. W.,* at *page* 331); *State v. Finch, supra* (99 *S. E.,* at *page* 414); *Doherty v. State,* 84 *Wis.* 152, 53 *N. W.* 1120 *(Sup. Ct.* 1893).

█ These authorities do not suggest the distinction made in the case of a fleeing misdemeanant, between shooting with intent to disable and shooting with intent to kill. The reason doubtless is this. In the case of flight or escape or refusal to obey orders, the officer is in a state of relative detachment in which the authorities find it just to impose liability for murder if the intent is to slay the misdemeanant. But where an officer is engaged in meeting physical resistance and obliged to overcome it, it would be unreasonable to find malice in an erroneous decision as to the need to kill. A fair analogy may be found in the doctrine of provocation. In the case of a citizen who is free to turn away, the law holds the crime to manslaughter if the homicide is committed in a sudden transport of passion upon sufficient provocation. The thesis there is that the homicide is attributable to the heat of blood rather than to malice,

and in ultimate terms it represents a fair concession to the frailties of man. *Brown v. State,* 62 *N. J. L.* 666, 710–711 (*E. & A.* 1899), affirmed 175 *U. S.* 172, 20 *S. Ct.* 77, 44 *L. Ed.* 119 (1899); 1 *Warren, Homicide* (*perm. ed.* 1938), § 85, *p.* 416. By parity of considerations, the illegal offer of resistance to one who is bound to press to overcome it should be deemed to equal provocation, and the purpose of the officer to discharge official duty should be held to dispel the existence of malice. We return to the proposition that the offense of an officer so motivated is in essence a culpable error of judgment made in the stress of an encounter he did not invite. A conviction for manslaughter, carrying a maximum of ten years imprisonment and $1,000 fine, *N. J. S.* 2*A*:113–5, is surely adequate. If, on the other hand, the determination to slay was not made to further a purpose to discharge duty, but rather stemmed from malice in the sense of another and wicked or evil motivation, then the officer, like any other offender, would be guilty of murder in one of its degrees. *Cf. Fugate v. Commonwealth,* 187 *Ky.* 564, 219 *S. W.* 1069 (*Ct. App.* 1920).

### III.

Defendant complains of the charge that if the killing is found to be unlawful, the offense is presumed to be murder in the second degree. There in fact was no objection to the instruction and defendant seeks to raise the issue on the basis of the denial of a request which did not fairly suggest the proposition now urged. However, since the issue will doubtless be raised upon a retrial and has been briefed and argued, it will serve the interest of the State and defendant to consider it.

Our cases have long adhered to the view that proof of a killing raises a presumption of malice, and that it is incumbent upon the defendant to adduce facts of justification, excuse or mitigation unless they arise out of the evidence produced against him. *State v. Huff,* 14 *N. J.* 240,

249 (1954); *State v. Mangino*, 108 *N. J. L.* 475, 477 (*E. & A.* 1931); *State v. Zellers*, 7 *N. J. L.* 220, 243 (*Sup. Ct.* 1824). Following the statutory prescription of degrees of murder, the presumption became one of murder in the second degree, with the State holding the burden to prove the additional elements required for a first degree verdict, and with the defendant still obliged to come forward, as theretofore, with evidence of justification, excuse or mitigation unless supplied by the State's case. *State v. Silverio, supra* (79 *N. J. L.*, at *page* 487); *Brown v. State, supra* (62 *N. J. L.*, at *page* 709).

Actually the trial judge did not charge that the killing itself would raise the challenged presumption. Rather, he required a preliminary finding of an *unlawful* killing, and as the term was defined in the charge, the jury would first have to conclude that the homicide was neither justified nor excused. Thus the presumption came into play only with respect to the degree of the offense after a determination that the slaying was criminal. The court doubtless took this intermediate approach in recognition of defendant's claimed status as a police officer in the affair.

But defendant says that his official status is enough to dissipate the existence of malice, the ingredient essential for murder in either degree. He cites *State v. Dierberger*, 96 *Mo.* 666, 10 *S. W.* 168, 171 (*Sup. Ct.* 1888), which held that where the issue is whether unnecessary force was used, the presumption of murder in the second degree should not be charged. In *Champion v. State, supra* (44 *So. 2d*, at *page* 620), it was said that the policeman's status tends to negative malice. In *Schell v. Collis*, 83 *N. W. 2d* 422, 426 (*N. D. Sup. Ct.* 1957) it was held that there is a presumption that a public officer acted with ordinary caution and in good faith. And in *Village of Barboursville ex rel. Bates v. Taylor*, 115 *W. Va.* 4, 174 *S. E.* 485, 488, 92 *A. L. R.* 1093 (*Sup. Ct. App.* 1934), the court stated that "An officer in making an arrest is presumed to act in good faith as to the extent of force employed by him." See also *State v. Hunter*, 106 *N. C.* 796, 11 *S. E.* 366, 368–369, 8 *L. R. A.*

529 (*Sup. Ct.* 1890). In the present case the trial court, upon defendant's request, expressly charged a presumption that the acts of the defendant, he being a public officer, were done legally, in good faith and within the scope of official duty. We have found a like presumption in fav.or of a public official who is sued civilly on a charge that his actions were motivated by actual malice. *Earl v. Winne,* 14 *N. J.* 119, 134 (1953).

 Upon the thesis that defendant never intended to act as policeman, the standard presumption would be appropriate as in any other case on the basis of existing law. But if the jury should find that defendant was involved in the affair as a police officer, the standard presumption would clash with the presumption that a public officer acted in good faith and within the scope of duty. Hence if the State prosecutes upon, and the evidence permits, the thesis that defendant, although a police officer, did not intend to act as such, the conventional charge as to the presumption of second degree should be given, with the direction however that, upon a finding by the jury that defendant was involved in the affair as a police officer, the presumption is removed, and the issue of guilt and the degree of the crime shall be determined without reference to it.

## IV.

The only other issue which need be considered is the propriety of denying defendant's motion to exclude from the courtroom the State's witnesses to the homicide and the events leading to it. The trial judge said that "I have long felt that the ideal procedure would be to have all witnesses excluded in all cases, civil and criminal," but denied the application because of the contemplated difficulty of securing compliance with an order and the possibility of error if the order should be violated.

The subject of sequestration of witnesses·is fully explored in 6 *Wigmore, Evidence* (3d ed. 1940), § 1837 *et seq.* The author, while expressing the conviction that sequestration

should be of right in a criminal case, a right which he places just below that of cross-examination as a device to expose falsity, recognizes that most jurisdictions commit the matter to the sound discretion of the trial judge. See also *Annotation,* 32 *A. L. R. 2d* 358 (1953). The wisdom of exclusion was noted early in our State in *State v. Zellers,* 7 *N. J. L.* 200, 226 (*Sup. Ct.* 1824), where Chief Justice Kirkpatrick observed that "We have often made rules to that effect, to prevent their hearing what the other witnesses detail in their evidence, for the less a witness hears of another's testimony the more likely is he to declare his own knowledge simply and unbiassed." And in *State v. Barts,* 132 *N. J. L.* 74, 84 (*Sup. Ct.* 1944), affirmed on opinion below, 132 *N. J. L.* 420 (*E. & A.* 1945), the court expressed the view that "In this kind of criminal case [homicide] the wisdom of excluding the lay witnesses generally is so apparent as to require no discussion of the point," adding, however, that "it is obvious that it is a matter for the prudence and sound discretion of the trial court."

Since the judgment must be reversed for other reasons, we need not consider whether sequestration should be a matter of right in a defendant in a criminal cause or whether there was prejudicial error. We are, however, satisfied that a sound exercise of discretion ordinarily requires that a motion for sequestration be granted. The witnesses in the present case are either related by blood or marriage or are neighbors and friends of each other. Such circumstances additionally suggest the desirability of sequestration because of the disinclination of persons so related or associated to contradict one another. The trial court, as indicated above, agreed that sequestration would be appropriate, but was troubled by the possibility of ensuing difficulty. The order would not apply to pretrial discussions among witnesses; it would be limited to exclusion from the courtroom of prospective witnesses and a direction to each not to discuss his testimony with the others until they shall have testified, with physical sequestration if necessary and the facilities are available. A violation, without fault on

the part of the State, would not constitute error; at least it is difficult to conceive of a case in which it would. *State v. Michalis*, 99 *N. J. L.* 31, 34 (*Sup. Ct.* 1923). In any event, the advantages inherent in sequestration outweigh the possibility of troublesome sequelae.

The judgment is reversed for the reason stated in "I" above and the matter remanded for further proceedings not inconsistent herewith.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS and PROCTOR—5.

*For affirmance*—Justices HEHER and WACHENFELD—2.