John E. USAVAGE, Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, et al., Defendants.

No. 10 Civ. 8219(JPO).

United States District Court, S.D. New York.

March 26, 2013.

Carl Steven Sandel, Sean Roman Strockyj, Morris Duffy Alonso & Faley, New York, NY, for Plaintiff.

Karla Daniella Denalli, The Port Authority of New York and New Jersey, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

J. PAUL OETKEN, District Judge.

This is a civil rights action in which Plaintiff, John Usavage, alleges that on October 31, 2009, the Port Authority of New York and New Jersey (PATH), the PATH Police Department, Police Officer James Sweizer, and Police Officer Michael Jones (collectively, "Defendants") violated his state and federal rights by subjecting him to excessive force. Defendants have moved for summary judgment on all of Plaintiff's claims. Plaintiff has moved for sanctions based on the alleged spoliation of evidence by PATH officials. For the reasons that follow, Plaintiff's motion is denied and Defendants' motion is granted in part and denied in part.

## I. Background [1]

### A. Facts Relevant to Allegations of Excessive Force

On October 31, 2009, Plaintiff attended a Halloween party in Manhattan. (Denalli Decl., Dkt. No. 21, Def. Ex. M ("Usavage Dep."), at 33:17–38:19.) Plaintiff states that he ate some food and consumed "about three beers" over the course of the festivities, which began at around 3:00 or 4:00 p.m. (*Id.* at 37:3–8.) When he left the party at around 9:00 p.m., Plaintiff traveled to the PATH 33rd Street station and boarded a train to New Jersey. (*Id.* at 36:19.) When his train arrived at the Journal Square (JSQ) station, Plaintiff

---

[1]. The following facts are drawn from the parties' depositions, evidence, and other submissions filed in connection with these motions, and are undisputed unless otherwise noted.

"[s]printed" off the train and "practically fell" down the stairs of a restricted area. (*Id.* at 40:5–20.) Once at the bottom of the stairs, he urinated. (*Id.* at 39:2–4.) Raishea Haines, a PATH engineer and operator, states that she saw Plaintiff in the track portion of the restricted area when he urinated. (Denalli Decl., Dkt. No. 21, Def. Ex. G ("Haines Dep."), at 18:7.) Plaintiff states that, although he urinated in a restricted area, he was located "twenty feet or something" from the tracks. (Usavage Dep. at 41:19–20.)

When she saw Plaintiff, Haines acted in accordance with PATH protocol by stopping her train and notifying the Control Center of Plaintiff's presence in the track area. She then exited the train and told the conductor to contact the Control Center. (Haines Dep. at 20:7–23:9.) Haines recalls that she asked Plaintiff why he was in the restricted track area and informed him that it was dangerous to remain there (*id.* at 27:8–11), but Plaintiff denies that any such interaction ever occurred between him and Haines (Usavage Dep. at 44:22–43:4). Haines adds that Plaintiff "did not appear to be normal," based on his walk and demeanor, and notes that Plaintiff walked right past her without acknowledging her presence. (Haines Dep. at 29:3–18.)

Frank Comes, an engineer switchman at the JSQ station, received an order from the terminal supervisor to cut power because of Plaintiff's presence in the track area. He then saw Plaintiff walk up from the stairway that leads to the track area, through a gate, onto the train platform, and then onto a train. (Denalli Decl., Dkt. No. 21, Def. Ex. D ("Comes Dep."), at 13:15–18:11.) Meanwhile, several PATH police officers—Juan Cancel, Jones, Nicholas Kowana, Wilfred Quashie and Sweizer—responded to the incident and arrived on the platform. Comes informed the officers that Plaintiff was on a train. (*Id.* at

18:23.) Comes states that Plaintiff was "attempting to conceal himself by hiding in the corner" of the train car (*id.* 21:1), while Plaintiff reports that he was standing because the train was crowded (Usavage Dep. at 44:21). The officers asked Plaintiff to exit the train. (*Id.* at 43:25–44:1.) Comes states that Plaintiff appeared to be intoxicated while disembarking the train. (Comes Dep. at 18:25–19:1.)

On Kowana's orders, Cancel arrested Plaintiff for trespassing and interfering with a railroad. (Denalli Decl., Dkt. No. 21, Def. Ex. I ("Kowana Dep."), at 23:18–24:7.) The parties dispute what happened during the arrest. Cancel states that Plaintiff acted belligerently toward the officers—mainly by cursing profusely at them, calling them "assholes," and saying that they should "get the fuck off [him]." (Denalli Decl., Dkt. No. 21, Def. Ex. C ("Cancel Dep."), at 44:10–14.) Cancel further reports that Plaintiff said that he "know[s] the system," that he "worked for the NYPD [Civilian Complaint Review Board]," and that he was going to get back at the arresting officers. (*Id.* at 44:2–5.) Cancel adds that Plaintiff failed to cooperate during the arrest, tensed up his body, and refused to follow directions, and that Cancel therefore handcuffed Plaintiff with his hands behind his back. (*Id.* at 34:17–18, 41:20–42:23, 45:24–46:23.) Cancel recalls that he needed help from Sweizer to move Plaintiff's arms so that Cancel could place the handcuffs on Plaintiff. (*Id.* at 43:8.) Plaintiff, in contrast, states that when he was arrested he acted in a calm manner despite being called derogatory names, including "rambo" and "faggot," by the officers. (Usavage Dep. at 49:4–9, 49:13–19.) Plaintiff reports that the officers acted unprofessionally and that he did not respond to the officers' insults, though he also states that he grew frustrated with the officers and was not polite and courteous. (*Id.* at 64:4–19.)

The Court has viewed video footage presented by the parties. The footage is disorganized and does not permit a clear determination as to whether Plaintiff was drunk, nor can the Court ascertain from the footage whether Cancel needed assistance in the arrest. (Strockyj Decl. Dkt. No. 37, Pl.'s Ex. A ("Arresting Video").) Further, the footage does not clearly show either Plaintiff or the officers acting inappropriately.

Plaintiff was then escorted to the Journal Square command and placed in a cell area. (Denalli Decl., Dkt. No. 21, Def. Ex. H ("Jones Dep."), at 44:10–11.) Plaintiff states that at some point on his way to the holding cell, Sweizer used the handcuffs as a weapon against him ("the Handcuff Incident"). In his deposition, Plaintiff stated:

> [S]weizer [ ], he was picking the handcuffs high up in the air. As we entered the station, he started lowering it. And he started pushing down on my shoulder, to the point where I was almost like duck walking. That's when I said to him "could you lighten up a little or loosen up a little." That's when he raised them all the way up to almost where my feet came off the ground. In one full jerking motion, he ripped my hands up in the air, put his knee in my back, with all his weight. First he did the right side. He compressed the handcuffs all the way down as hard as he could. And then he did the same thing to the left ...

(Usavage Dep. at 77:24–78:15.) Later in the deposition, when asked again about the Handcuff Incident, Plaintiff stated that Sweizer raised Plaintiff's handcuffed arms upward "as far [as] I thought they could go" (id. at 191:2–3), and that just as he entered the police station,

> [Sweizer] lowered them again all the way down ... He started pushing down on the cuffs and pushing down on my right shoulder. So he is pushing down

on the cuffs with his left hand and he is pushing down on my right shoulder with his right hand. And that's when I said, "Could you loosen up a little bit" or "Lighten up," or something like that. And that's when he ripped them straight up into the air and clamped down first on my right hand and then on my left ... A few seconds later, he took the cuffs off.

(Id. at 193:12–194:3.) Plaintiff reports that pain in his left wrist lasted ten minutes before the onset of numbness, but in "the right wrist and the right hand, the pain was considerable, even to this day." (Id. at 73:15–19.)

Plaintiff discussed the Handcuff Incident in a recorded interview with PATH officer Lieutenant Geraldo Silva on November 17, 2009. In that interview, Plaintiff states that Sweizer was "pushing down on the cuffs," so he "said something like, you know, could you loosen the cuffs or something like that," and Sweizer "then tightened them quite hard ... like all the way." (Denalli Decl., Dkt. No. 21, Def. Ex. K ("Silva Dep."), at 75:8–24.) Plaintiff clarified that Sweizer "gripped with all his strength." (Id. at 76:5–6.) When asked "He closed them further than they were?", Plaintiff replied "Until I couldn't feel my hands. I still cannot feel the top of my right hand." (Id. at 76:20–24.) In this interview, Plaintiff states that he thought the Handcuff Incident occurred either at the top or the bottom of the stairs on the way to JSQ command, but also states that he was in too much pain to recognize his surroundings and notes that he was "very distracted" by pain. (Id. at 77:11–78:18.) Sweizer disputes Plaintiff's statements pertaining to the Handcuff Incident. (Denalli Decl., Dkt. No. 21, Def. Ex. L ("Sweizer Dep."), at 66:5–72:11.) Jones was standing nearby when the Handcuff Incident allegedly occurred.

Upon arrival at the police command, Plaintiff was taken to the cell area, where he was placed in a holding cell by Sweizer (the "Holding Cell Incident"). In the cell, Sweizer searched Plaintiff while Jones watched and assisted. During the search, Sweizer asked Plaintiff to remove a drawstring from his pants. (Usavage Dep. at 55:12–21.) Plaintiff explained to Sweizer that the drawstring could not be removed and demonstrated so by tugging on the string several times. (*Id.*) Plaintiff states that Sweizer continued to tell him to take out the string, and that:

> To demonstrate that it was really attached, because apparently he didn't believe me, I took one step towards him pulling on it. And I said, 'here. It's attached to the pants.' He thought I was lying. So he tried to remove it by shaking me or whatever. I started flopping around. And then I started to fall. That's when I touched him. That's when he lunged at me with an opened hand and slammed my head into the wall.

(*Id.* at 58:21–59:7.) In his deposition, Plaintiff mentions that on the night in question, he complained "primarily" about his right hand and right wrist, observing that "the back of my head, I felt there was no blood. I didn't see any." (*Id.* at 73:12–15.)

Sweizer disputes Plaintiff's account of the Holding Cell Incident. According to Sweizer, he told Plaintiff to remove the string pursuant to PATH safety procedure. (Sweizer Dep. at 74:7–20.) Sweizer recalls that when he told Plaintiff to remove the string, Plaintiff cursed at him and insisted that Sweizer "do it himself." (*Id.* at 74:13.) Sweizer then attempted to remove the drawstring and realized that it "wouldn't come out." (*Id.* at 74:23–75:2.) Sweizer reports that Plaintiff never told him that the string would not come out (*id.* at 75:6), and states that, "as [I] was pulling the draw string, [Plaintiff] grabbed my

arm, my right arm" (*id.* at 76:18–19). Sweizer adds that, in response, he "restrained [Plaintiff] onto the bench" inside the cell by pushing Plaintiff's chest. (*Id.* at 78:6–9.) Jones, who was assisting Sweizer, states that Plaintiff told Sweizer that "the string did not come out of his pants." (Jones Dep. at 48:22–23.) Jones adds that after Sweizer told Plaintiff to remove his pants, Plaintiff stated "he wasn't going to or something along those lines." (*Id.* at 49:20–21.) According to Jones, Sweizer "grabbed [Plaintiff] by the chest area and pushed him down to the cell area bench." (*Id.* at 50:6–7.) Jones states that he does not recall whether Plaintiff's head hit the back wall. (*Id.* at 50:10.)

The Court has independently examined an edited video clip of the Holding Cell Incident. (Strockyj Decl., Dkt. No 37, Pl's. Ex. C ("Cell Footage").) This video lacks sound, but it does afford a clear view of the interaction. Sweizer appears to ask Plaintiff to pull the drawstring out of his pants. After indicating and demonstrating that he cannot do so, Plaintiff takes a few steps that land him very close to Sweizer. Sweizer then puts his arm out and onto Plaintiff's chest as if to motion that Plaintiff should keep a distance. Sweizer attempts to pull the string out of Plaintiff's pants by tugging at it aggressively while maintaining a hand on Plaintiff's chest; this causes Plaintiff to shake and flop around. After several seconds, Plaintiff moves his hand to Sweizer's elbow. Sweizer jerks his own arm away, then puts one hand on Plaintiff's chest, keeps his other hand on Plaintiff's drawstring, and uses both hands to forcefully push Plaintiff. Plaintiff is propelled backward a few steps and is then knocked into a sitting position when his legs hit up against a bench attached to the wall. Plaintiff's head does appear to knock against the wall as he is forced into a sitting position, but it does not appear to be a hard blow and Plaintiff

does not display any sign of head injury. Indeed, as Plaintiff is pushed back onto the bench, he stretches out both his arms and seems to stabilize his landing. Sweizer restrains Plaintiff on the bench with both hands. At that point, several other officers—including Jones—enter the cell and observe, but none of the officers employ any further force against Plaintiff.

After being fingerprinted and photographed, Plaintiff was released at approximately 12:45 a.m. (Denalli Decl., Dkt. No. 21, Def. Ex. F ("Gilleece Dep."), at 31:22.) At that time, Officer Greg Gilleece, who released Plaintiff from the holding cell, gave Plaintiff a copy of his complaint summons, which Plaintiff then crumpled up. (*Id.* 32:4–16.) After his release, Plaintiff complained of pain in his right wrist and Gilleece told the police desk to call an ambulance. (*Id.* at 34:2–6.) Plaintiff did not want to go at first, but eventually took an ambulance from the JSQ command to Jersey City Medical Center ("JCMC"). (*Id.* at 34:14–35:23; Usavage Dep. at 93:6–95:14.) According to JCMC records, Plaintiff complained of pain and numbness in his right hand and wrist. (Denalli Decl., Dkt. No. 21, Def. Ex. W ("Hospital Records."), at 6–7, 12.) The JCMC records, under "Assessment," indicate "right wrist and right hand pain" and "injury from handcuffs." (*Id.* at 7.) When asked to rank the severity of his pain on a scale from zero to ten, Plaintiff selected zero. His treating physician's notes contain a diagnosis of neuropraxia and the observation that sensation was "intact but decreased to the dorsal surface of right hand." (*Id.* at 12–13.) Plaintiff was able to "move the right hand without difficulty." (*Id.* at 14.) At the hospital, X-rays were taken of Plaintiff's wrist, but did not show any broken or fractured bones. (Strockyj Decl. Dkt. No 37, Ex. G ("Fietti Report").) Within an hour of his admittance to JCMC, Plaintiff was discharged and instructed to follow up within two days (Hospital Records at 14),

but did not do so (Usavage Dep. at 121:3–4). Plaintiff states that he followed up at the Veterans Administration Hospital in Lyons, New Jersey, but cannot recall the name of his physician or if he was given any prescription medication for the pain. (*Id.* at 122:10–23:4).

Upon leaving JCMC, Plaintiff returned to the JSQ command and filed a complaint alleging, *inter alia,* that the handcuffs had been excessively tight and that his head had been slammed against the wall while he was in the cell. (Strockyj Decl. Dkt. No. 37, Ex. E.) Specifically, in that complaint, he alleged that:

> After leaving NYC on the PATH it took approx[imately] 50 minu[ute]s to reach the Journal Sq. Upon arrival I went to the end of the platform to relieve myself. At the moment I reached the end of the platform the PATH train to Newark pulled up. I ran back towards the train and was placed in handcuffs. I asked the officer to loosen the cuffs and instead he tightened them which caused my right wrist to go numb. I was treated at Jersey City Hospital. The same officer who handcuffed me also asked me to take a string out of my pants. When I demonstrated to the officer that the string was attached to the waste of the pants, the officer grabbed me by the neck and slammed my head against the wall. He then tore my pants in attempting to remove the string. My newspapers were missing from my bag. Upon request, Sgt. Kowana retrieved them.

(*Id.*)

Plaintiff reports that the Handcuff Incident resulted in a long-lasting injury. He notes that "initially, it was a very sharp pain … about as much pain as I would ever want to experience, or not experience … Ten [on a scale of one to ten]." (Usavage Dep. at 97:11–17.) He adds: "[B]oth wrists went numb after that for quite a

while, at least an hour, two hours, probably about two hours. And I couldn't feel anything. And then after about two hours, I could feel a lot." (*Id.* 97:19–24.) Plaintiff recalls that the "lower portion" of his "right hand and wrist" were "discolored and swollen" later that night. (*Id.* at 95:19–20, 96:11–12.) He states that "Even to this day if I press [in the joint area where the thumb is], I can feel it. How do I describe that? Also to this day, on the outside portion above the wrist about an inch where the bone is, is still not good to this day ... Pain. I can hear clicking. Limited motion sometimes. Sharp pain sometimes, depending on the motion, depending on how I move." (*Id.* at 96:18–97:4; *see also id.* at 124:18–125:22.) Plaintiff notes in his deposition testimony that "there is tingling or numbness in all five [fingers] right now as we speak, especially the thumb" (*id.* at 126:13–15), and indicates that the pain and numbness have thwarted his desire to take up piano lessons (*id.* at 130:2–10). He describes the pain as "intermittent" (*id.* at 132:20).

At the recommendation of his friend and attorney, Carl Sandel, Plaintiff followed up with Dr. Vincent G. Fietti, Jr. on April 7, 2010. (*Id.* at 120:3–121:5) In a letter to Sandel, Fietti reported that "exam of [Plaintiff's] wrist shows an oval area of numbness on the dorso-ulnar aspect of his wrist and hand," "forearm rotation is full but rapid prono-supination causes a painful click on the ulnar side of [Plaintiff's] wrist," and "[Plaintiff] has full motion of his fingers but intrinsic muscles of the right hand are slightly weaker than on the left." (Fietti Letter at 1–2.) Fietti notes

his "clinical impression" that "patient had signs and symptoms of compression of the ulnar nerve at the wrist and possible [sic] a tear of the triangular fibrocartilage," adding that he referred Plaintiff to a specialist for MRI and EMG/NCV tests. (*Id.* at 2.) The MRI revealed "an area of inflammation and thickening of the extensor carpi ulnaris tendon at the level of the ulnar styloid consistent with a compression injury," and the EMG "confirmed an injury to the dorsal sensory branch of the right ulnar nerve at the wrist level." (*Id.*) Fietti noted that local steroid injections or exploration and decompression of the nerve and tendon might be indicated, and that "it is likely that without treatment [Plaintiff] will have permanent symptoms." (*Id.*) In letters dated September 26, 2011, two other physicians—Herbert Sherry and Daniel Feuer—report that they examined Plaintiff and did not discover any evidence of nerve damage. (Denalli Decl., Dkt. No. 48, Exs. DD, EE.)

## B. Facts Relevant to Allegations of Spoliation [2]

Plaintiff's complaint was assigned to Lt. Geraldo Silva of the Civil Complaint Investigative Unit. (Silva Dep. at 17:11–15.) In relevant part, Plaintiff's complaint stated: "At the moment I reached the end of the platform the PATH train to Newark pulled up. I ran back towards the train and was placed in handcuffs. I asked the officer to loosen the cuffs and instead he tightened them which caused my right wrist to go numb. I was treated at Jersey City Hospital." Silva states that the complaint did

---

**2.** The parties have each provided selections of video footage to the Court, claiming that this footage illuminates the spoliation issue by revealing, through negative inference, what the missing footage might have shown. The Court has examined this footage and concludes that it sheds little light on the matter, particularly given that the footage has been spliced together by the parties, comes from a number of cameras, is at times of poor quality, and, on its face, says little about the potential probative value of any missing footage. In any event, because the Court decides this issue on the ground of culpability, the value of this footage is minimal.

not indicate the exact location where Plaintiff was placed in handcuffs. (Silva Dep. at 23:19–23.) Silva also notes that he conducted an interview with Plaintiff after the complaint was filed. In this conversation, Plaintiff told Silva about how, when he was arrested, an officer "push[ed] down on the cuffs" (*id.* at 75:8), how Sweizer "tightened the handcuffs" (*id.* at 77:9), and how Sweizer "slammed [Plaintiff's] head against the wall (*Id.* at 82:3–5). When asked to pinpoint where the alleged incident occurred, Plaintiff repeatedly referred to the staircase leading to and from the station platform where he had been arrested. (*Id.* at 70:20–22, 78:7–8, 79:16–18.) Plaintiff also explained that the incident occurred when he "cleared the steps at that point to the top" (*id.* at 77:14–15), but added that "I'm not positive" when asked if he had "walked up the stairs" (*id.* at 77:20–22). Silva reports that he also interviewed the officers who responded to the incident in order to better determine which footage would be relevant to the incident. (*Id.* at 108:25–109:3.)

Silva states that, based on his conversation with Plaintiff and the other information available to him, he made a request for video footage that he believed relevant to Plaintiff's complaint. (*Id.* at 55:8–9.) Silva notes that he "primarily took interest in the areas where Mr. Usavage claimed to have had any physical interaction, negative or otherwise with the police" (*id.* at 112:12–15), and that he "base[d] the video that [he] request[ed] on the complaint's, allegation[s], and location[s] of [the] allegations" (*id.* at 120:21–23). Silva therefore requested footage primarily from cameras located on the platform and in the cell area. (*Id.* at 121.) He did not request footage from the walkway inside the station leading to the cell:

> [I]t's based on the investigation and where the investigation will have led me and the location where the complainant ... had said where the allegation took place of either force or whatever other allegations he had of discourtesy ... [This would not include the walkway because] he alleged that the handcuffing wrenching happened at the top of the stairs. There is no stairs inside the police station as you well know. And he alleged that the physical force utilized against him in retaliation to the pants being ripped and the head being against the wall was inside of cell 1. So those are the areas that I requested video of.

(*Id.* at 125:4–22.) Silva states that the video footage is saved on hard drive like devices and, thus, he has no way of knowing how long footage recorded by PATH cameras would be preserved and what footage would be erased if not specifically requested. (*Id.* at 65:5–15.)

## C. Procedural Posture

By letter dated February 3, 2012, Plaintiff withdrew his false arrest, false imprisonment, and malicious prosecution claims as to all defendants. At a status conference on March 21, 2012, Plaintiff withdrew all remaining claims against Officers Cancel and Flynn, and the Court dismissed those claims. At a conference on April 12, 2012, Plaintiff also withdrew all remaining claims against Officer Quashie, and the Court dismissed those claims as well. In his filing in opposition to summary judgment, Plaintiff withdraws "all of his § 1985 and § 1986 claims" and "all claims against retired Sgt. Kowana and Police Officer Greg Gilleece." These claims are now dismissed. The remaining defendants are thus PATH, the PATH Police Department, Sweizer, and Jones. The remaining claims are state and federal law claims of excessive force against Sweizer and Jones, state law claims of assault and battery against Sweizer and Jones, state law claims of assault and battery against PATH and the PATH Police Department on a theory of *respondeat superior* liability, and § 1983

policy and custom liability against PATH and the PATH Police Department. Defendants have moved for summary judgment on all remaining claims.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate in a case where the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Vacold, LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir.2008). The moving party bears the burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" only if it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For there to be a "genuine" issue about the fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir.2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper. *Catlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir.1996). The nonmoving party can defeat summary judgment by presenting evidence sufficient to create a genuine issue of material fact, though "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen*

*Assocs. v. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir.2001).

### B. Spoliation

Plaintiff has moved for the sanction of an adverse inference on the ground of spoliation. Specifically, Plaintiff alleges that PATH should be sanctioned for failing to preserve video footage from two surveillance cameras that allegedly would have been in a position to record what happened to the Plaintiff while he was escorted to the holding cell in JSQ Command.

. Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999). A federal district court may sanction a party for spoliation of evidence in violation of a court order under Federal Rule of Civil Procedure 37(b). *See John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988). Even absent violation of a court order, a district court may sanction a party for spoliation of evidence in the exercise of the court's "inherent power to control litigation." *West*, 167 F.3d at 779. The purpose of a spoliation sanction is to "(1) deter parties from violating discovery obligations; (2) place the risk of an erroneous judgment on the party that wrongfully created the risk; and (3) restore the prejudiced party to the same position that it would have been in absent the discovery violation by an opposing party." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y.2010).

 Whether the court sanctions a party for violation of a court order or as part of its inherent power to control litigation, a party seeking sanctions for the spoliation of evidence must establish three elements: "(1) that the party having con-

trol over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y.2004) (Scheindlin, J.) (citations omitted). The obligation to preserve evidence arises "where a party is on notice that litigation is likely to be commenced." *Rutgerswerke AG & Frendo S.p.A. v. Abex Corp.*, No. 93 Civ. 2914, 2002 WL 1203836, at *13 (S.D.N.Y. June 4, 2002) (citation and quotation marks omitted). A defendant destroys evidence with a culpable state of mind when the defendant destroys it negligently, intentionally, or willfully. *Zubulake*, 229 F.R.D. at 431. The state of mind requirement varies according to the circumstances of each case. *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir.1999) ("Our case-by-case approach to the failure to produce relevant evidence seems to be working. Such failures occur along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." (quotation marks and citation omitted)). When the destruction is negligent, the party seeking sanctions must prove that the evidence was relevant. *Zubulake*, 229 F.R.D. at 431. "In the context of a request for an adverse inference instruction, the concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant." *Id.* In contrast, when evidence is destroyed intentionally or willfully, that fact alone is sufficient to demonstrate relevance and favorability. *Id.* at 430–31.

Here, the gravamen of Plaintiff's argument is that PATH failed to preserve portions of camera footage that might have captured the alleged Handcuff Incident.

Plaintiff acknowledges that PATH officials did preserve some footage, but argues that footage from certain camera angles was improperly excluded and, as a result, this footage was ultimately erased.

This claim does not succeed because Plaintiff fails to prove the culpability element prerequisite to a sanction for spoliation. First, the Court discerns no malice or recklessness in the fact that potentially relevant footage ultimately was erased, since the creation and retention of footage pursuant to ordinary PATH procedures is driven by operational and technical factors entirely independent of this case. (Denalli Decl., Dkt. No. 40, Def. Ex. 3, at 48–51, 69–71.) Nor has Plaintiff adduced any evidence that even remotely supports the conclusion that Silva or any other PATH official acted with actual malice or recklessness in selecting footage.

Second, the Court concludes that PATH did not act negligently. PATH was under no duty to preserve the disputed footage because, as a result of Plaintiff's own statements, PATH was not on notice of the potential salience of that footage. Plaintiff filed a complaint with PATH on the night of the disputed events in which he declined even to specify a general location within JSQ station or offer guidance as to which evidence might be relevant. To the contrary, his filing referred only to being "placed in handcuffs" and then those handcuffs being tightened. This vague complaint, on its own, did not trigger a duty on the part of PATH officials to obtain camera footage from each and every part of JSQ station that could theoretically have been relevant to his claims. Then, when Plaintiff spoke with Silva just over two weeks later, Plaintiff's description of the Handcuff Incident focused almost exclusively on the staircase, not the vestibule and hallway in which Plaintiff now alleges the Incident occurred.

While merely negligent violation of the duty to preserve evidence of potential relevance to litigation may in some cases justify sanctions, the scope of that duty must remain bounded by common sense. Here, the combination of Plaintiff's own complaint, Plaintiff's own statements in his interview with Silva, and Silva's investigation did not disclose a non-speculative basis to believe that the disputed footage would be relevant to Plaintiff's claims. Accordingly, Silva did not act negligently in excluding that footage from his request. Plaintiff's counter-argument that the footage compiled by Silva contains a suspicious gap is beside the point. Silva acted under no duty to compile *all* footage, but rather under a duty to compile *potentially relevant* footage. The fact that, with perspective adjusted by hindsight and over a year of discovery, it might be helpful for him to have preserved the disputed footage does not control. At the time, on the basis of reasonably available information, neither Silva nor any other PATH official acted with a mental state that would support a sanction for spoliation. Plaintiff's motion is therefore denied.

## C. Excessive Force [3]

### 1. General Standard

■■■ "Claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir.2010). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir.2002) (quoting *Graham*, 490 U.S. at 397, 109 S.Ct. 1865); *see also Pelayo v. Port Auth.*, 893 F.Supp.2d 632, 641–42 (S.D.N.Y.2012) ("A police officer's use of force is 'excessive' in violation of the Fourth Amendment if it is 'objectively unreasonable' in light of the facts and circumstances known to the officer." (citations omitted)).

■■■ "To determine whether the amount of force applied to the plaintiff was reasonable the Court should consider: [i] the severity of the crime at issue, [ii] whether the suspect poses an immediate threat to the safety of the officers or others, and [iii] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Pelayo*, 893 F.Supp.2d 632, at 641–42 (quotation marks and citation omitted). "A de minimis use of force will rarely suffice to state a Constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir.1993). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

---

**3.** "Article 1, par. 7 of the New Jersey Constitution has been interpreted as affording greater protections than the Federal Constitution. *See State v. Hempele*, 120 N.J. 182, 576 A.2d 793 (1990)." *Peschko v. City of Camden*, No. 02 Civ. 5771, 2006 WL 1798001, at *4 (D.N.J. June 28, 2006). Because the Court's conclusion does not hinge on idiosyncrasies of federal qualified immunity doctrine, the analysis set forth below under the Fourth Amendment is dispositive as to Defendants' motion for summary judgment on Plaintiff's excessive force claim under the New Jersey Constitution.

amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. Accordingly, "[w]hether the force used in connection with the arrest is reasonable depends on a careful weighing of the totality of the circumstances in each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue." *Felmine v. City of New York,* No. 09 Civ. 3768, 2011 WL 4543268, at *18 (E.D.N.Y. Sept. 29, 2011), *reconsideration denied,* No. 09 Civ. 3768, 2012 WL 1999863 (E.D.N.Y. June 4, 2012).

### 2. Handcuffs and Excessive Force

 "Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell,* No. 10 Civ. 1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). This modified standard reflects the need for a careful balance. On the one hand, "[i]t is well established that the right to make an arrest accompanies with it the right to use some degree of physical coercion ... [and] to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont v. City of New York,* 371 F.Supp.2d 202, 214–15 (E.D.N.Y.2005) (citations omitted). On the other hand, "overly tight handcuffing can constitute excessive force." *Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Esmont,* 371 F.Supp.2d at 215 (citations omitted). As always, this inquiry must reflect the totality of the circumstances, including any facts that bear on whether use of an unusual degree of force may have been justified. *See Matthews v. City of New York,* 889 F.Supp.2d 418, 442–43

(E.D.N.Y. Sept. 5, 2012) (noting that where "plaintiffs allegedly were compliant with police orders and not violent or resisting arrest," this fact "suggests that their arrests likely did not necessitate an unusual degree of force").

 The injury requirement is "particularly important." *Sachs,* 2012 WL 3822220, at *14. "Courts have found that handcuffing can give rise to a § 1983 excessive force claim where plaintiff suffers an injury as a result." *Gonzalez v. City of New York,* No. 98 Civ. 3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000). However, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch,* 567 F.Supp.2d at 468; *accord Gonzalez,* 2000 WL 516682, at *4 ("[I]f the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force."). These injuries need not be "severe or permanent," *Vogeler v. Colbath,* No. 04 Civ. 6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005), but must be more than merely "de minimis," *Washpon,* 561 F.Supp.2d at 407. *See also Mesa v. City of New York,* No. 09 Civ. 10464, 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) ("[W]hile a sustained injury that requires doctors' visits is not a necessary element of a successful excessive force claim, where a plaintiff suffers from *de minimis* injury, it is more difficult to establish that the force used was excessive in nature." (citations omitted)). The most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage. *See, e.g., Washpon,* 561 F.Supp.2d at 407 (scarring), *Esmont,* 371 F.Supp.2d at 214–15 (nerve damage); *Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990) (scarring).

Courts may decide excessive force claims, including claims arising from allegations of excessively tight handcuffs, on motions for summary judgment. *See Matthews,* 889 F.Supp.2d at 442–43 ("The determination of whether tight handcuffing that causes pain and numbness satisfies the injury requirement may be presented in a motion for summary judgment." (citation omitted)); *Ferraresso v. Town of Granby,* 646 F.Supp.2d 296, 306 (D.Conn. 2009) ("While reasonableness is traditionally a question of fact for the jury, 'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.'" (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994))). "'[U]nsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient' to sustain a claim of excessive force from handcuffing." *Matthews,* 889 F.Supp.2d at 442–43 (quoting *Esmont,* 371 F.Supp.2d at 215). That said, a "plaintiff's testimony about the injuries and subsequent treatment alone is sufficient to support an excessive force claim on a motion for summary judgment." *Pelayo,* 893 F.Supp.2d at 642–43 (citing *Mickle v. Morin,* 297 F.3d 114, 121–22 (2d Cir.2002)); *see also id.* ("The plaintiff's sworn assertions of excessive force causing injury and requiring medical attention raise sufficient questions of material fact and preclude their resolution as a matter of law on a motion for summary judgment." (citation omitted)). The fact that a plaintiff sought emergency medical treatment right after a handcuffing incident may also support a finding of injury at the summary judgment stage. *See Washpon,* 561 F.Supp.2d at 407 (denying summary judgment where, *inter alia,* plaintiff "did seek emergency medical treatment right after the incident").

### 3. Qualified Immunity and Excessive Force

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citations omitted). Accordingly, "[a] qualified immunity defense is established only if (1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Green v. Montgomery,* 219 F.3d 52, 59 (2d Cir. 2000).

A plaintiff can prevail against a qualified immunity defense by raising a genuine issue of material fact as to whether the officers' conduct violated clearly established law and as to whether "officers of reasonable competence could disagree on the legality of the defendant[s'] actions." *Id.* (citations omitted); *see also Toliver v. City of New York,* No. 10 Civ. 5803, 2012 WL 6013098, at *8 (S.D.N.Y. Dec. 3, 2012) ("Summary judgment on the

issue of qualified immunity as to Defendant Remy is inappropriate at this stage because, if Plaintiff's allegations are true, Officer Remy would not be entitled to qualified immunity . . . ." (citations omitted)); *De Michele v. City of New York*, No. 09 Civ. 9334, 2012 WL 4354763, at *18 (S.D.N.Y. Sept. 24, 2012) (denying summary judgment because "[r]esolution of Plaintiff's excessive force claim and Defendants' qualified immunity defense requires credibility determinations that are the province of a jury" (citing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994)); *Russo v. DiMilia*, 894 F.Supp.2d 391, 414–15 (S.D.N.Y.2012) ("[b]ecause in this case genuine, material, factual disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied." (quotation marks and citation omitted))).

"It is well established that qualified immunity may operate as a defense to excessive force claims." *Mesa*, 2013 WL 31002, at *17 (citing *Finnegan v. Fountain*, 915 F.2d 817, 822–23 (2d Cir.1990)). By the same token, "[i]t is beyond dispute that the right to be free from excessive force has long been clearly established." *Green*, 219 F.3d at 59; *cf. Fera v. City of Albany*, 568 F.Supp.2d 248, 256 (N.D.N.Y.2008) ("To determine if a right is clearly established, a court examines (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and Second Circuit support the existence of the right in question; and (3) whether under preexisting law a reasonable officer would have understood that his or her acts were unlawful." (citations omitted)).

 In the excessive force context, "the question for the purposes of qualified immunity is 'whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.'" *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir.1995) (citation omitted). Because the clearly established Fourth Amendment excessive force inquiry also hinges on a determination of objective reasonableness, "it appears that at least in some excessive force cases the . . . analysis ultimately converge[s] on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 n. 4 (2d Cir.2003); *see also Washpon*, 561 F.Supp.2d at 407–08 ("Since the law in this area is well-established, 'in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits.'" (quoting *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003))). In some cases, however, it may appropriate to afford the defendants an "extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.'" *De Michele*, 2012 WL 4354763, at *17 (quoting *Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

### 4. Handcuff Incident

In a traditional handcuff-based excessive force claim, a plaintiff alleges that a police officer tightened handcuffs to an unreasonable degree, that the plaintiff protested to no avail, and that the plaintiff suffered serious injury as a result. Here, Plaintiff alleges a variation on that familiar theme: specifically, that Sweizer pushed down on the handcuffs over Plaintiff's protests and compressed them to an excessive degree, thereby causing physical injury. This difference does not justify a departure from the general rule, since the heart of Plaintiff's allegation—that an officer used handcuffs as a weapon against an arrestee—falls squarely within the imagined scenario for which this rule was created. *See*

*Lynch,* 567 F.Supp.2d at 468; *Esmont,* 371 F.Supp.2d at 214–15.

Applying that rule, the Court concludes that summary judgment is inappropriate. In the post-incident complaint that Plaintiff filed at JSQ command, in his recorded interview with Silva, in the hospital records from JCMC, and again in his deposition, Plaintiff has described a course of events that creates a genuine dispute of fact as to each element of an excessive force claim.

The first question is whether the handcuffs were "unreasonably tight" under the totality of the circumstances. *Esmont,* 371 F.Supp.2d at 215. The parties disagree about the relevant circumstances. According to Defendants, Plaintiff was drunk, rude, and uncooperative. On their account, he threatened them with punishment, cursed them off, and tensed up his body when they placed him under arrest. It is not at all clear that even these circumstances, at the moment of arrest, would justify a later use of handcuffs in the manner alleged by Plaintiff, particularly given that the Handcuff Incident is alleged to have occurred near the cell block—by which point Plaintiff had been handcuffed and escorted most of the way to JSQ command by a team of police officers. Regardless, Plaintiff has painted a very different picture. In his version of events, the officers acted in an unprofessional manner, needlessly antagonized Plaintiff, and abused their position of power. Plaintiff adds that he acted cooperatively and was not drunk. Presented with these competing accounts, along with some unhelpful footage, the Court must adopt

Plaintiff's narrative for purposes of this summary judgment motion.[4] It is true that Plaintiff's testimony is countered by statements from numerous police officers, but the shared and liability-thwarting recollections of multiple defendant police officers in an excessive force claim cannot overwhelm or discredit a plaintiff's account merely through sheer force of numbers. There is thus a genuine dispute of material fact concerning the first element of Plaintiff's excessive force claim.

The second question is whether "the defendants ignored the arrestee's pleas that the handcuffs were too tight." *Esmont,* 371 F.Supp.2d at 215. In Plaintiff's interview with Silva just a few weeks after the disputed events, Plaintiff explained that "I asked the officer to loosen the cuffs and instead he tightened them, which caused my right hand and wrist to go numb." In his deposition testimony, Plaintiff recalls asking Sweizer "could you lighten up a little or loosen up a little," at which point Sweizer allegedly "ripped my hands up in the air, put his knee in my back, with all his weight ... [and] compressed the handcuffs all the way down as hard as he could." Asked about the Handcuff Incident once again in the deposition, Plaintiff reports that "I said, 'Could you loosen up a little bit' or 'Lighten up,' or something like that. And that's when he ripped them straight up into the air and clamped down first on my right hand and then on my left." Defendants deny these statements, but their denials, standing alone, do not transform a "he said, they

4. Even if the Court concluded that Plaintiff was intoxicated, a conclusion bolstered by support from the Haines and Comes depositions, it would not follow that the alleged use of force was justified by that circumstance. Further, the Haines and Comes depositions do not speak to other critical circumstances involved in the arrest and the officers' choice about how much force to employ. In that section of Defendants' briefs, Defendants rely principally on the testimony of officers at the scene. The competing accounts presented by Plaintiff and Defendants—neither of which is conclusively supported by independent evidence—preclude summary judgment.

said" dispute into a summary judgment-worthy case.

Defendants' main argument with respect to the second element is that the Court should discredit Plaintiff's testimony because it has not remained perfectly consistent across time. The alleged discrepancies include: (1) variation in Plaintiff's account of where the Handcuff Incident occurred and (2) failure by Plaintiff to identify which officer allegedly used the handcuffs as a weapon against him. Specifically, Defendants argue that Plaintiff's initial complaint, filed on the night in question, indicates that the Handcuff Incident occurred on the train platform and that Cancel, rather than Sweizer, employed excessive force. They add that, in contrast, Plaintiff's statements to Silva refer to a staircase near the station platform, rather than a corridor leading to JSQ command. Defendants assert that these supposed contradictions in Plaintiff's account exclude this case from the realm of genuine factual dispute.

Defendants, however, have imposed an interpretation on Plaintiff's statements that the statements cannot fairly bear. The complaint filed at JSQ command states only that "I ran back towards the train and was placed in handcuffs. I asked the officer to loosen the cuffs and instead he tightened them. . . ." Plaintiff describes the events only in general terms and hardly commits himself to a particular location or arresting officer. There is no necessary contradiction between the complaint and his subsequent recollections. Further, given that Plaintiff wrote this complaint late at night, after a visit to the hospital, and while allegedly in pain, the Court declines to impute sinister motive to the non-specificity of his narrative. Defendants also take issue with Plaintiff's statement to Silva that he believed the Handcuff Incident occurred on or near the stairs leading from the train platform.

Yet Plaintiff repeatedly qualified these statements in his conversation and noted that he could not identify the location with precision. Moreover, on a summary judgment standard of review, Plaintiff might be forgiven his lack of detailed memory, several weeks after the fact, concerning the location of a series of events that occurred immediately after an arrest, in an unfamiliar location, while he was allegedly in great pain from the handcuffs. Because Defendants' arguments to undermine Plaintiff's account do not succeed, the Court concludes that Plaintiff has demonstrated a genuine dispute of material fact as to the second element of his excessive force claim.

■ The third question turns on the "degree of injury to [Plaintiff's] wrists." *Esmont*, 371 F.Supp.2d at 215. This injury must transcend "temporary discomfort," *Lynch*, 567 F.Supp.2d at 468, though it need not be "severe or permanent," *Vogeler*, 2005 WL 2482549, at *9. Plaintiff offers three pieces of evidence to demonstrate the requisite injury: statements to Silva, deposition testimony, and a letter from Fietti. Taken together, this evidence describes an injury that satisfies the injury requirement. In his statements to Silva, Plaintiff indicated that he still could not feel the top of his right hand—a symptom characteristic of nerve damage. Plaintiff provides more detail in his deposition, where he describes sharp pain, followed by numbness, discoloration, and swelling, on the night in question. He adds that he still feels pain and clicking in his wrist, that he experiences bouts of numbness and tingling localized around his wrist and thumb, and that this intermittent pain has affected his lifestyle. These statements, in turn, are corroborated by a letter from Fietti to Plaintiff's attorney. In that letter, Fietti reports that he conducted a physical examination of Plaintiff that re-

vealed numbness in Plaintiff's hand and wrist, as well a painful clicking on the ulnar side of Plaintiff's wrist. Fietti describes "signs and symptoms of compression," notes that an MRI revealed inflammation and thickening consistent with a compression injury, and states that an EMG/NCV test confirms nerve injury. Fietti concludes that these injuries may not be permanent if Plaintiff receives treatment.

The injuries described in Plaintiff's interview with Silva, Plaintiff's deposition, and the Fietti letter include a species of long-lasting nerve damage that plainly satisfies the "particularly important" injury requirement. *Sachs*, 2012 WL 3822220, at *14. Indeed, nerve damage is one of the principal forms of injury that can be deemed sufficient to prevent summary judgment in excessive force cases. *See, e.g., Esmont*, 371 F.Supp.2d at 214–15 ("Placing handcuffs on an arrestee tight enough to cause nerve damage may ... constitute excessive force in violation of the Fourth Amendment." (citations omitted)).

The central question, then, is whether the evidence that Plaintiff adduces at this stage in the litigation suffices to create a genuine dispute about this material fact. In short, the answer to that question is yes. It is well established that a "plaintiff's testimony about the injuries and subsequent treatment alone is sufficient to support an excessive force claim on a motion for summary judgment." *Pelayo*, 893 F.Supp.2d at 642–43 (citation omitted); *see also id.* ("The plaintiff's sworn assertions of excessive force causing injury and requiring medical attention raise sufficient questions of material fact and preclude their resolution as a matter of law on a motion for summary judgment." (citation omitted)). Here, Plaintiff described his injuries at length in his interview with Silva and in his deposition. But even if

Plaintiff's own statements did not suffice, the Court need not rely on them to deny summary judgment. The fact that Plaintiff sought emergency medical treatment right after the Handcuff Incident substantially bolsters the case for a finding of injury at the summary judgment stage. *See Washpon*, 561 F.Supp.2d at 407. To an even greater degree, so does the Fietti Letter. Although some courts have required more than sworn assertions from a plaintiff, adopting the view that "[u]nsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient to support a claim of excessive force from handcuffing," *Esmont*, 371 F.Supp.2d at 215, Plaintiff's claims in this case are corroborated by Fietti's examination and discussion of medical test results. *See also Matthews*, 889 F.Supp.2d at 443–44 ("Plaintiffs should be aware that in order to withstand summary judgment, they must provide medical evidence that the handcuffs caused serious, long-lasting, or persistent injury."). Applying the summary judgment standard of review, the Court concludes that a reasonable juror could be persuaded by Plaintiff's evidence of injury.

This conclusion withstands Defendants' forceful assault on Plaintiff's statements and Fietti's credibility. Defendants argue that Plaintiff's characterizations of his suffering on the night in question are greatly exaggerated, pointing to video clips in which Plaintiff appears to make effective use of his wrists and fingers without expressing pain or distress, the brevity of Plaintiff's stay in the JCMC emergency department (less than an hour), the fact that Plaintiff checked "zero" when asked in JCMC to rate his pain on a scale from "zero" to "ten," and the fact that Plaintiff was not prescribed pain medication at JCMC. Defendants also seek to impugn Fietti's credibility by pointing out that Plaintiff was referred to Fietti by his

friend and counsel in this action, Sandel. Defendants add that two subsequent medical examinations contradict Fietti's account and suggest that Plaintiff suffered no lasting nerve injury.

These are powerful arguments. They might well persuade reasonable jurors. They are not, however, arguments that so decisively settle the matter as to flatten the genuine dispute of fact created by Plaintiff's evidence. As the Second Circuit has explained:

> When determining whether there is a genuine issue of fact to be tried, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought. On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried. Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.

*United States v. Rem,* 38 F.3d 634, 643–44 (2d Cir.1994) (internal citations omitted). Here, Defendants invite the Court to conclude that neither Plaintiff nor Fietti has provided credible testimony. Such a determination is beyond the office of summary judgment.

 The last remaining issue is whether Defendants' invocation of qualified immunity alters the conclusion. The Court concludes that it does not. The constitutional law that governs excessive force claims, including handcuff-based excessive force claims, was clearly established at the time of the events in question. *See Green,* 219 F.3d at 59. By the same token, no reasonable officer could have believed that the use of force alleged in this case qualified as objectively reasonable under the circumstances. *See Lennon,* 66 F.3d at

425. Read in the light most favorable to Plaintiff, the record indicates that Plaintiff was acting cooperatively and was firmly under police control when the group of officers escorted him to JSQ command in handcuffs. Plaintiff alleges that, en route, Sweizer swung Plaintiff's arms up, then jammed them down, and then maliciously compressed the handcuffs so tightly that Plaintiff suffered intense pain and long-lasting injury. This behavior, under these circumstances, falls far from the "hazy border between excessive and acceptable force." *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151. As Judge McMahon has explained, "[a]ny reasonably competent police officer would know that he should not cuff a prisoner so tightly as to cause injury—especially injury that is immediately apparent, because it is visible to the naked eye." *Golio,* 459 F.Supp.2d at 265; *see also Matthews,* 889 F.Supp.2d at 443–44 ("[G]iven that plaintiffs allegedly did not resist arrest, the use of excessively tight handcuffs by the [police officers] could have been unwarranted." (citation omitted)). Accordingly, Defendants' qualified immunity defense does not succeed at this point—and Defendants' motion for summary judgment on Plaintiff's excessive force claim arising from the Handcuff Incident is denied.

### 5. Holding Cell Incident

 Defendants' motion for summary judgment on Plaintiff's excessive force claim arising from the Holding Cell Incident is granted. The Court has examined footage of the incident, as well as the parties' depositions, and concludes that the defendant officers' actions were objectively reasonable under the circumstances. Specifically, the officers undertook a routine search of Plaintiff pursuant to PATH safety protocols, Plaintiff reached out and touched Sweizer, Sweizer used minimal force in pushing Plaintiff back to the bench, and Plaintiff does not appear to

have sustained any sort of injury in connection with this incident. Given the officers' reasonable concern about a threat to their safety and the de minimis use of force involved in this incident, no reasonable juror could conclude that the officers violated Plaintiff's Fourth Amendment rights in this interaction.

### 6. Duty to Intercede

■■■■■ "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.1994). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* at 557 (internal citations omitted). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.* (citation omitted).

■■■■ In the qualified immunity context, "[a] police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir.1997) (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727). "Further, the failure to intercede must be under circumstances making it objectively unreasonable for [an officer] to believe that his fellow officers' conduct did not violate those rights." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

■■■ Failure to intervene claims are "contingent upon the disposition of the primary claims underlying the failure to intervene claim." *Matthews*, 889 F.Supp.2d at 443–44 (citing *Coleman v. City of New York*, No. 07 Civ. 1051, 2010 WL 571986, at *5 (S.D.N.Y. Feb. 2, 2010)).

■■■ Where the record does not disclose an underlying excessive force violation, and does not suggest that an officer who observed the disputed incident could have been aware of the use of excessive force, summary judgment on a duty to intercede claim is appropriate. *See Ferraresso v. Town of Granby*, 646 F.Supp.2d 296, 308 (D.Conn.2009). However, summary judgment is inappropriate when there are genuine disputes of material fact "concerning what the officers who failed to intervene observed regarding the other officers' alleged violations of plaintiffs' constitutional rights." *Matthews*, 889 F.Supp.2d at 443–44.

■■■■ Defendant Jones was present during the escort of Plaintiff from the station platform to JSQ command, along with Sweizer and Quashie. Plaintiff argues that Jones' physical proximity and his presumed knowledge of the law that governs excessive force justify the conclusion that Jones was in a position to intercede and nonetheless declined to do so. Defendants' principal response is that the Court should grant summary judgment as to Jones because Plaintiff voluntarily dismissed an otherwise identical claim against Quashie, who was also present during the Handcuff Incident. This argument does not succeed; the fact that Plaintiff dismissed a claim against one officer in no way relieves any other officer on the scene of liability for excessive force or failure to intervene. In the alternative, Defendants argue that Jones would not have been in a position to realize that Sweizer used the handcuffs as a weapon and, in any event,

Sweizer acted too quickly for Jones to intercede. This argument runs aground on the standard for summary judgment. Read in the light most favorable to Plaintiff, Sweizer jabbed Plaintiff's arms up and then down, and then independently compressed the handcuffs around each of Plaintiff's wrists. At the very least, this account supports a genuine factual dispute regarding Jones' awareness of whether Sweizer was using the handcuffs as a weapon against Plaintiff. It also raises disputed factual questions about whether, given the pace of events, Jones had an opportunity to intercede and thereby prevent the alleged constitutional violation. *See Matthews,* 889 F.Supp.2d at 443–44. Qualified immunity does not alter this analysis; the relevant constitutional law was clearly established and, under the circumstances as interpreted in the light most favorable to Plaintiff, it would have been objectively unreasonable for Jones to believe that Sweizer was not violating Plaintiff's rights by compressing the handcuffs over Plaintiff's express objection.

### 7. State Law Assault and Battery Claims Against Sweizer and Jones

Under New Jersey law, "[i]n order to succeed on [an] assault and battery claim, [a plaintiff] must demonstrate that [a defendant] attempted to cause, or purposely, knowingly, or recklessly caused him bodily injury." *Hendrix v. City of Trenton,* No. 06 Civ. 3942, 2009 WL 5205996, at *13 (D.N.J. Dec. 29, 2009); *see also Caldwell v. KFC Corp.,* 958 F.Supp. 962, 970 (D.N.J.1997). "When effecting an arrest, a police officer may use such force as is reasonably necessary under the circumstances." *Hill v. Algor,* 85 F.Supp.2d 391, 411 (D.N.J.2000) (citing *State v. Williams,* 29 N.J. 27, 148 A.2d 22, 29 (1959)). "To determine whether the force used was excessive, it is necessary to examine 'the facts as they reasonably ap-

peared to the officer at the time of the occurrence.' " *Id.* (quoting *Williams,* 148 A.2d at 29). "Where a police officer uses excessive force in effectuating an arrest, that officer may be liable for assault and battery." *Id.* Where a summary judgment record "contains several disputed issues of fact with regard to the circumstances surrounding" an arrest, it may be "impossible for the Court to determine . . . the nature and amount of force which would have been reasonable under the particular circumstances." *Mantz v. Chain,* 239 F.Supp.2d 486, 507 (D.N.J.2002).

The New Jersey Tort Claims Act (NJTCA) creates a qualified immunity against common law tort claims. *See* N.J.S.A. 59:3–3. "The 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is [also] used to determine questions of good faith arising under N.J.S.A. 59:3–3." *Hill,* 85 F.Supp.2d at 411 (citing *Lear v. Township of Piscataway,* 236 N.J.Super. 550, 566 A.2d 557, 558–59 (1989)). Further, the NJTCA does not shield a public employee from liability "if it is established that his conduct . . . constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3–14. "Willful misconduct is the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden. . . . [I]t requires much more than an absence of good faith and 'much more' than negligence." *Hill,* 85 F.Supp.2d at 411–12 (internal citations omitted). Courts will not grant summary judgment where there is a genuine dispute of material fact regarding willful conduct or the application of New Jersey's law of qualified immunity. *See id.* at 412.

For the reasons set forth above with respect to the excessive force claim, Defendants' motion for summary judgment on

Plaintiff's state law assault and battery claims against Sweizer is denied as to the Handcuff Incident and granted as to the Holding Cell Incident.

## D. Municipal Liability

### 1. Section 1983

■■■■ "[U]nder § 1983, local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, — U.S. —, —, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (quotation marks and citations omitted). "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* (citations omitted). Thus, a municipality will be held liable for the acts of its employees only where "(1) an official policy or custom [ ](2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth.*, 615 F.3d 129, 140 (2d Cir. 2010) (quotation marks omitted). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 131 S.Ct. at 1350. However, this failure to train theory of liability requires proof of "deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "Boilerplate" assertions of an unconstitutional policy do not suffice. *See Matthews*, 889 F.Supp.2d at 445–46.

■■■■ Defendants' motion for summary judgment on Plaintiff's § 1983 municipal liability claim is granted. Plaintiff argues that PATH's policy of allowing internal investigators to determine which footage to provide to a passenger when that passenger is involved in an incident, and of then deleting all non-preserved footage, supports § 1983 liability. Plaintiff's theory is that, but for their knowledge that this policy might allow their conduct to remain unrecorded, PATH police officers—including Sweizer and Jones—would be more reluctant to use excessive force. This argument does not succeed. First, because Plaintiff did not include it in the Complaint, but rather describes it as a new argument in his opposition papers, the argument is waived. Second, even if the argument were not waived, it would fail because of the rule that a municipality cannot be held liable under § 1983 unless a policy or custom *causes* a plaintiff to be subjected to denial of a constitutional right. Here, the requisite causal link between the municipal policy and the alleged denial of a constitutional right is extraordinarily attenuated—so attenuated that, in the relevant sense of the term, PATH's policy of preserving video footage cannot be said to have caused the alleged excessive use of force. Summary judgment on this claim is therefore proper.[5]

---

5. Plaintiff's complaint also includes a "failure to train" theory of municipal liability, though his filings in opposition to the motion for summary judgment essentially abandon that argument. In any event, Plaintiff has not described any sort of deliberate indifference on PATH's part to the persons with whom its employees come into contact, and for that reason any such argument would fail. *See Connick*, 131 S.Ct. at 1350; *Canton*, 489 U.S. at 388, 109 S.Ct. 1197.

### 2. State Law

Under the NJTCA, "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A. 59:2–2(a). However, "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. 59:2–10. Noting that excessive force, assault, and battery are intentional torts, courts have held that public entities cannot held be held liable for such acts by their employees because of the exception for "willful misconduct." *E.g., Merman v. City of Camden,* 824 F.Supp.2d 581, 597 (D.N.J.2010).

Defendants' motion for summary judgment on Plaintiff's state law claims against PATH and the PATH Police Department, notably his assault and battery claims based on a theory of *respondeat superior,* is granted. Assault and battery are intentional torts and therefore fall within the NJTCA exception for willful conduct. For that reason, New Jersey law prohibits municipal liability on these facts and summary judgment is appropriate.

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for sanctions is DENIED and Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is directed to terminate the motions at Dkt. Nos. 19 and 28.

SO ORDERED.